# EXHIBIT A

52-596

| **SUMMONS - CIVIL**<br>JD-CV-1 Rev. 10-09<br>C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,<br>52-48, 52-259, P.B. Secs. 3-1 through 3-21, 8-1 | **STATE OF CONNECTICUT<br>SUPERIOR COURT**<br>www.jud.ct.gov | **See page 2 for Instructions** |
|---|---|---|

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.
☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.
☐ "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed (Number, street, town and zip code)<br>(C.G.S. §§ 51-346, 51-350)<br>123 Hoyt Street, Stamford, CT 06905 | Telephone number of clerk<br>(with area code)<br>( 203 ) 965-5308 | Return Date (Must be a Tuesday)<br>X05 CV 09-5011561 S<br>November          23 , 2010<br>Month          Day          Year |
|---|---|---|
| ☒ Judicial District          G.A.<br>☐ Housing Session          ☐ Number: | At (Town in which writ is returnable) (C.G.S. §§ 51-346, 51-349)<br>Stamford | Case type code (See list on page 2)<br>Major: T          Minor: 90 |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code)<br>Silver Golub & Teitell LLP, Stamford, CT and Pullman & Comley LLC, Hartford, CT (see below) | Juris number (to be entered by attorney only)<br>058005 & 409177 |
|---|---|
| Telephone number (with area code)<br>( 203 ) 325-4491 & ( 860 ) 424-4300 | Signature of Plaintiff (if self-represented) |

| Number of Plaintiffs: 3 | Number of Defendants: 5 | ☒ Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | | Name (Last, First, Middle Initial) and Address of Each party (Number; Street; P.O. Box; Town; State; Zip; Country, if not USA) | |
|---|---|---|---|
| First<br>Plaintiff | Name:<br>Address: | Retirement Program for Employees of the Town of Fairfield;<br>c/o David S. Golub, Esq., Silver Golub & Teitell LLP, 184 Atlantic St., P.O. Box 389, Stamford, CT 06906 and<br>Richard C. Robinson, Esq., Pullman & Comley LLC, 90 State House Sq., Hartford, CT 06103 | P-01 |
| Additional<br>Plaintiff | Name:<br>Address: | Retirement Program for Police Officers and Firemen of the Town of Fairfield;<br>c/o David S. Golub, Esq., Silver Golub & Teitell LLP, 184 Atlantic St., P.O. Box 389, Stamford, CT 06906 and<br>Richard C. Robinson, Esq., Pullman & Comley LLC, 90 State House Sq., Hartford, CT 06103 | P-02 |
| First<br>Defendant | Name:<br>Address: | Noel, Jr., Walter M., 175 Round Hill Road, Greenwich, CT 06831-3724 | D-50 |
| Additional<br>Defendant | Name:<br>Address: | Tucker, Jeffrey H., 1035 5th Avenue, New York, NY 10028-0135 and 4 the PN, Roslyn, NY 11576-2933 | D-51 |
| Additional<br>Defendant | Name:<br>Address: | Madoff, Peter B., 200 Algoma Road, Palm Beach, FL 33480-4902 | D-52 |
| Additional<br>Defendant | Name:<br>Address: | Madoff, Mark D., 21 Cherry Valley Road, Greenwich, CT 06831-3009 and 885 Broadway, New York, NY<br>c/o Connecticut Secretary of State, 30 Trinity St., Hartford, CT 06106 | D-53 |

## Notice to Each Defendant

1. YOU ARE BEING SUED. This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at www.jud.ct.gov under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at www.jud.ct.gov under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. The Clerk of Court is not allowed to give advice on legal questions.

| Signed (Sign and "X" proper box) | ☒ Commissioner of the Superior Court<br>☐ Assistant Clerk | Name of Person Signing at Left<br>David S. Golub | Date signed<br>10/26/10 |
|---|---|---|---|

| If this Summons is signed by a Clerk:<br>a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.<br>b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.<br>c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.<br>d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | File Date |
|---|---|

| I certify I have read and understand the above: | Signed (Self-Represented Plaintiff) | Date | ATTEST: A TRUE COPY |
|---|---|---|---|
| Name and address of person recognized to prosecute in the amount of $250<br>Martha Jackson, 361 Canterbury Lane, Fairfield, CT 06825 | | | |
| Signed (Official taking recognizance, "X" proper box) | ☒ Commissioner of the Superior Court<br>☐ Assistant Clerk | Date<br>10/26/10 | Docket No.          ABRAHAM GLASSMAN<br>STATE MARSHALL<br>HARTFORD COUNTY |

(Page 1 of 2)

**CIVIL SUMMONS**
**CONTINUATION OF PARTIES**
JD-CV-2  Rev. 4-97

STATE OF CONNECTICUT
SUPERIOR COURT

FIRST NAMED PLAINTIFF (Last, First, Middle Initial)
Retirement Program for Employees of the Town of Fairfield

FIRST NAMED DEFENDANT (Last, First, Middle Initial)
Noel, Jr., Walter M.,

| NAME (Last, First, Middle Initial, if individual)    ADDRESS (No., Street, Town and ZIP Code) | CODE |
|---|---|
| Town of Fairfield, c/o David S. Golub, Esq., Silver Golub & Teitell LLP, 184 Atlantic St., P.O. Box 389, Stamford, CT 06906 and Richard C. Robinson, Esq. Pullman & Comley LLC, 90 State House Sq., Hartford, CT 06103 | 03 |
|  | 04 |
|  | 05 |
|  | 06 |
|  | 07 |
|  | 08 |
|  | 09 |
|  | 10 |
|  | 11 |
|  | 12 |
|  | 13 |

| NAME (Last, First, Middle Initial, if individual)    ADDRESS (No., Street, Town and ZIP Code) | CODE |
|---|---|
| Madoff, Andrew H., 57 Tomac Avenue, Greenwich, CT 06831 and 131 East 66th Street, Apt. 67a, New York, NY  10021 c/o Connecticut Secretary of State, 30 Trinity St., Hartford, CT 06106 | 54 |
|  | 55 |
|  | 56 |
|  | 57 |
|  | 58 |
|  | 59 |
|  | 60 |

| | FOR COURT USE ONLY - FILE DATE |
|---|---|
| 61 | |
| 62 | |
| 63 | DOCKET NO. |

CIVIL SUMMONS-Continuation

| | |
|---|---|
| RETURN DATE:   NOVEMBER 23, 2010 | SUPERIOR COURT |
| THE RETIREMENT PROGRAM FOR EMPLOYEES OF THE TOWN OF FAIRFIELD, THE RETIREMENT PROGRAM FOR POLICE OFFICERS AND FIREMEN OF THE TOWN OF FAIRFIELD, AND THE TOWN OF FAIRFIELD | COMPLEX LITIGATION DOCKET |
| V. | AT STAMFORD |
| MAXAM CAPITAL MANAGEMENT, LLC; MAXAM CAPITAL GP LLC; MAXAM CAPITAL MANAGEMENT LIMITED; SANDRA L. MANZKE; WALTER M. NOEL, JR.; JEFFREY H. TUCKER; PETER B. MADOFF; MARK D. MADOFF; and ANDREW H. MADOFF | OCTOBER 26, 2010 |

## COMPLAINT

### INTRODUCTION

Plaintiffs – the retirement plans of the Town of Fairfield, which provide pension benefits to over 1,500 active, retired and disabled Town employees, and the Town of Fairfield, which is responsible for funding its retirement plans – bring this action to recover the multi-million dollar losses the Town's retirement plans have sustained as a result of defendants' wrongful participation in the notorious fraudulent investment scheme perpetrated by Bernard L. Madoff. Plaintiffs have been victimized by defendants' enormous greed, which caused defendants to knowingly participate in and aid and abet Madoff's criminal conduct and to abrogate their professional responsibilities in order to reap hundreds of millions of dollars in corrupt monies.

Plaintiffs seek compensatory relief, as well as common law and statutory punitive damages from all defendants on account of their intentional participation in criminal conduct and breach of their professional duties and unjust receipt and retention of improper monies.

## I.   THE PARTIES

### A.   Plaintiffs

1.   Plaintiffs The Retirement Program for Employees of the Town of Fairfield and The Retirement Program for Police Officers and Firemen of the Town of Fairfield [the "Plans"] provide retirement benefits for over 1,500 active, retired and disabled employees and former employees of the Town of Fairfield.

2.   Plaintiff the Town of Fairfield [the "Town"] is responsible, pursuant to the Fairfield Town Charter, for funding the retirement benefits payable to members of the plaintiff Plans.

### B.   Defendants

3.   Defendant Maxam Capital Management, LLC ["Maxam Capital"] is a limited liability company formed pursuant to the laws of the State of Delaware and headquartered in Darien, Connecticut. Defendant Maxam Capital is a registered investment adviser. It provides investment management and consulting services to the investor community and markets and sells investments in limited partnership hedge funds it creates.

4.      Defendant Maxam Capital GP LLC ["Maxam Capital GP"] is a limited liability company formed pursuant to the laws of the State of Delaware and headquartered in Darien, Connecticut. Defendant Maxam Capital GP is the general partner of the Maxam Absolute Return Fund, LP, a limited partnership hedge fund created and marketed by defendant Maxam Capital.

5.      Defendant Maxam Capital Management Limited ["Maxam Capital Management"] is the administrator of the Maxam Absolute Return Fund, LP and an affiliate of defendants Maxam Capital controlled, directly or indirectly, by defendants Manzke and Maxam Capital.

6.      Defendant Sandra L. Manzke ["Manzke"] formed defendant Maxam Capital in April 2005 and has served as the company's Chairman and Chief Executive Officer and on its Investment Committee since it was formed.  Defendant Manzke is also a principal and co-owner of defendant Maxam Capital GP.  (Although conduct by defendant Manzke prior to her formation of defendant Maxam Capital is referenced in this Complaint, plaintiffs' claims against her are limited to conduct subsequent to April 2005.)

7.      Defendants Maxam Capital, Maxam Capital GP, Maxam Capital Management and Manzke are referred to, collectively, as the "Maxam Defendants."

8.      Defendants Walter M. Noel, Jr. ["Noel"] and Jeffrey H. Tucker ["Tucker"] are founding partners, principals and members of the Executive Committee or Board of Directors of Fairfield Greenwich Group, an asset management company with offices in Greenwich, Connecticut that creates, markets and sells investments in limited partnership hedge funds, including the Fairfield Sentry Limited

3

Fund ("Fairfield Sentry") and other hedge funds, and other investment vehicles that (through December 2008) invested, directly or indirectly, with Bernard L. Madoff.

9.      Defendants Noel and Tucker are referred to, collectively, as the "Fairfield Greenwich Group Defendants."

10.      The individuals and entities identified in paragraphs 3-6 and 8 are referred to, collectively, as the "Feeder Fund Defendants."

11.      Defendant Peter B. Madoff is the brother of Bernard L. Madoff and, at all times relevant to plaintiffs' claims herein, was Senior Managing Director and Chief Compliance Officer of Bernard L. Madoff Investment Securities, LLC ("BLMIS"), a broker-dealer entity that was used to implement the criminal scheme described in this Complaint.

12.      Defendant Mark D. Madoff is Bernard L. Madoff's son. Defendant Mark D. Madoff was employed by BLMIS from 1986 through December 2008. For a number of years prior to December 2008, defendant Mark D. Madoff was Co-Director of Trading at BLMIS and Controller and Director at Madoff Securities International Ltd. ("MSIL"), a British brokerage firm that was also used to implement the criminal scheme described in this Complaint.

13.      Defendant Andrew H. Madoff is Bernard L. Madoff's son. Defendant Andrew H. Madoff was employed by BLMIS from 1988 through December 2008. For a number of years prior to December 2008, defendant Andrew H. Madoff was also Co-Director of Trading at BLMIS and Controller and Director at MSIL.

14.     Defendants Peter B. Madoff, Mark D. Madoff and Andrew H. Madoff are referred to, collectively, as the "Madoff Family Member Defendants."

## II.     STATEMENT OF THE FACTS

### A.     Defendants' Criminal Scheme

15.     For fifteen years or more prior to December 2008, Bernard L. Madoff ("Madoff"), a New York investment manager, acting in concert with the defendants in this action and others, perpetrated a criminal scheme that defrauded investors out of billions of dollars and, in particular, defrauded the plaintiff Plans out of millions of dollars of retirement funds.

16.     Madoff and the defendants in this action perpetrated this scheme through BLMIS, a registered broker-dealer business located in New York City that Madoff owned and that he and the other Madoff Family Member Defendants controlled and operated, and through MSIL, a related British entity controlled and operated by Madoff and the other Madoff Family Member Defendants.

17.     Throughout defendants' criminal scheme, BLMIS was composed of three business units: a market-making business, a proprietary trading desk, and an investment advisory business.  Defendants' criminal scheme was run through BLMIS' investment advisory business, but the proceeds of the scheme were used to support all of the business units of BLMIS, which would otherwise have not been profitable, and were shared among Madoff, the Feeder Fund Defendants and each of the Madoff Family Member Defendants (and others), who received huge, fraudulently derived, financial benefits from the illicit proceeds of the scheme.

5

18.     From at least the early 1990's, Madoff purported to manage money for investors through BLMIS' investment advisory business.  Madoff purported to utilize a so-called "split-strike conversion" strategy that purportedly entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.  Madoff represented that, through this strategy, he was able to generate enormous and steady financial returns for his clients.

19.     In fact, from at least the early 1990's on, Madoff never actually made any trades for any of the customers whose money he was purporting to manage, but rather operated a classic Ponzi scheme in which investors' funds were used to pay other investors' requests for redemption of principal and reported profits and for the personal enrichment of Madoff, the Feeder Fund Defendants, the Madoff Family Member Defendants, and others.  In particular, although Madoff purported to be conducting investment activity in his customers' investment advisory accounts at BLMIS, he engaged in no actual transactions through BLMIS for his investment advisory customers,

20.     As a part of the criminal scheme, Madoff purported to engage in trading activity for the Madoff Family Member Defendants (and other favored associates) through BLMIS's investment advisory business as a way of funneling stolen proceeds to the Madoff Family Member Defendants (and others).  Madoff caused millions of dollars stolen from other investment advisory business customer accounts to be placed in the accounts of each of the Madoff Family Member Defendants (and others).  These stolen funds were recorded as the proceeds of (fictitious) trades, and the Madoff Family Member

6

Defendants (and others) withdrew such illicit funds from their investment advisory accounts, knowing that the funds had been illegally and fraudulently procured from BLMIS's investment advisory customer accounts.

21.     The criminal scheme perpetrated by Madoff, the Feeder Funds Defendants, the Madoff Family Member Defendants and others ultimately unraveled in 2008, when customers' requests for redemptions overwhelmed the flow of new investments, causing the collapse of the scheme.

22.     On December 11, 2008 Madoff was arrested by federal agents for violation of criminal securities laws, including securities fraud, investment adviser fraud, and mail and wire fraud, and the Securities and Exchange Commission filed a complaint against Madoff and BLMIS for perpetrating fraud through the investment adviser activities of BLMIS.

23.     On March 12, 2009, in the criminal case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC) in the United States District Court for the Southern District of New York, Madoff pleaded guilty to an 11-count criminal information charging securities fraud, investment adviser fraud, and mail and wire fraud in connection with the investment adviser activities of BLMIS and money laundering through MLIS.  On June 29, 2009, Madoff was sentenced to a prison term of 150 years.

**B.**   **The Feeder Fund Defendants Knowingly Participate in the Criminal Scheme.**

24.   To enable the scheme to succeed, Madoff needed to obtain a continuing flow of new investor money to fund redemption requests (and the distribution of illicit proceeds to Madoff, the Madoff Family Member Defendants and others) and to conceal from individual investors his non-existent trading.  Madoff entered into agreements with the Feeder Funds Defendants (and others) pursuant to which, in return for enormous fees, the Feeder Fund Defendants offered and sold interests in limited partnership hedge funds (and other investment vehicles) that funneled billions of dollars in investment funds to Madoff that kept the Ponzi scheme afloat.  The limited partnerships (and other investment vehicles) created by the Feeder Fund Defendants also helped to conceal Madoff's fraud by serving as the recipients of Madoff's fictitious trading information, thus eliminating the need for Madoff to create and supply fictitious trading data to thousands of individual customers and shielding Madoff's fraudulent trades from individual investor (and SEC) scrutiny.

25.   Madoff's criminal scheme could not have succeeded without the participation and material assistance of the Feeder Fund Defendants (and other individuals and entities) as described in paragraph 24.

26.   The Feeder Fund Defendants had knowledge that Madoff's investment advisory operations at BLMIS involved illegal activity and knowingly agreed to and did participate in Madoff's illegal activity.

8

27.     The Feeder Fund Defendants believed that Madoff was engaged in "front-running," a form of illegal insider trading, or some other form of illegal trading, that (they believed) enabled him to achieve his consistently successful and abnormal investment results.

28.     Prior to December 2008, the Feeder Fund Defendants entered into illegal arrangements with Madoff pursuant to which they agreed to provide him, in return for enormous fees, with billions of dollars in third party investment funds to be managed by him in illegal ways.

29.     The Fairfield Greenwich Group Defendants entered into the illegal scheme at least as early as the mid-1990's.

30.     Manzke also entered into the illegal scheme in the mid-1990's and formed the other Maxam Defendants in or after April 2005 to help perpetrate the illegal scheme.

31.     The Feeder Fund Defendants remained active and knowing participants in the scheme through December 2008.

32.     Pursuant to their scheme with Madoff, the Feeder Fund Defendants raised money to be placed under Madoff's illegal management at BLMIS and to provide them with lucrative fees by offering and selling investments in limited partnership hedge funds which they marketed to investors through the use of material false statements and omissions of material fact concerning Madoff's illegal activity.

9

33.    To implement this scheme, the Feeder Fund Defendants (or entities they controlled) created and marketed investments in limited partnerships that would operate as hedge funds placing money with Madoff.   The Feeder Fund Defendants offered and sold investments in these hedge fund partnerships to individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds.  The Feeder Fund Defendants (or entities they controlled) served as the general partner of these limited partnerships and, as general partner, retained Madoff to manage the limited partners' investments, even though they knew that Madoff's investment operations involved illegal conduct.

34.    The Feeder Fund Defendants' conduct was undertaken in concert with Madoff pursuant to their illegal arrangement with Madoff in order to obtain corrupt fees based on Madoff's illegal investment management activities.

35.    Pursuant to the illegal scheme, Madoff only charged the Feeder Fund Defendants for commissions on the investment trades he (purportedly) undertook, and the Feeder Fund Defendants were allowed, either directly or through entities they controlled, to charge the individual investors percentage fees on the invested assets and, in some instances, on Madoff's reported annual profits.  The Feeder Fund Defendants, either directly or through entities they controlled, also charged the investors administrative fees for record-keeping and auditing of Madoff's investment activity.  The Feeder Fund Defendants entered into this illegal scheme with Madoff in order to obtain all of these fees.

10

36.     Beginning in the 1990's and continuing through December 2008, the Feeder Fund Defendants marketed these limited partnership investment opportunities by representing to potential purchasers that Madoff had for years achieved, and was continuing to achieve, consistent annual returns in the range of 8-12% (with positive monthly returns in virtually every month) on the funds he was managing through use of a so-called "split-strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.  The Feeder Fund Defendants represented that, through use of this strategy, Madoff could limit losses when stock prices decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

37.     While the Feeder Fund Defendants believed that Madoff was achieving the annual results he claimed, they knew that it was not through use of the split-strike conversion strategy.  The Feeder Fund Defendants knew that the strategy could not produce consistent annual returns of 8-12% in up and down markets (and that it was impossible for Madoff to have obtained positive monthly returns in virtually every month); they knew that other market professionals had attempted to implement a similar split-strike conversion strategy, but that no other market professionals had ever been able to replicate Madoff's claimed continuing success through such strategy; they knew that the claimed volume in options trading that would have had to exist if Madoff was, in fact, following such strategy did not exist;

11

and they knew that the claimed trades in S&P 100 securities that would have been reported if Madoff was, in fact, following such strategy, did not exist.

38.    The Feeder Fund Defendants knew that Madoff could not legally obtain the consistent annual results he reported and believed that he was taking advantage of insider trading information derived from BLMIS or employing some other illegal means to illegally achieve such results.

39.    The Feeder Fund Defendants did not advise potential purchasers of their limited partnership investment offerings that Madoff's reported investment returns could not reasonably be produced by his purported split-strike conversion strategy or that they believed he was trading illegally to obtain the purported returns, even though such information was material to the investors' decision whether or not to purchase the limited partnership offerings.

40.    The "feeder funds" operated by the Feeder Fund Defendants – the limited partnership vehicles utilized by the Feeder Fund Defendants to implement their scheme with Madoff – were critical instrumentalities of the criminal scheme.  They were necessary to the continued success and concealment of Madoff's illegal activity, as the billions of dollars invested in these vehicles and forwarded to Madoff for "management" enabled Madoff to keep his Ponzi scheme afloat.  They further served to limit the risk of exposure of the criminal scheme, as they enabled Madoff to report his investment activity to entities controlled by the Feeder Fund Defendants, rather than to individual investors, and thus provided Madoff and the Feeder Fund Defendants with a layer of protection from individual investor review or audit of Madoff's investment activities.

12

41.     Over the years from the 1990's through December 2008, the Feeder Fund Defendants raised billions of dollars for Madoff's illegal operations through the sale of limited partnership investments facilitated by the Feeder Fund Defendants' false statements of material fact and omissions of material facts, and the Feeder Fund Defendants, directly or indirectly through entities they controlled, received hundreds of millions of dollars in illegal fees, knowing that Madoff was engaged in illegal conduct with respect to the monies they placed under his management.

42.     In particular, the Fairfield Greenwich Group Defendants, the principals and partners of Fairfield Sentry and other hedge funds and investment vehicles that, directly or indirectly, invested with Madoff, placed $5 billion of investor funds with Madoff and received annual fees of 1% of the investor's investment and 20% of any investment returns (reported by Madoff to be in the range of 10% annually). As of 2008, the Fairfield Greenwich Group Defendants represented to their investors that the investors' positions with Madoff were worth in excess of $7 billion, and the Fairfield Greenwich Group Defendants were in a position to receive over $225 million in illicit fees annually pursuant to their illegal scheme.

43.     The Maxam Defendants – the principals and general partner of the Maxam Absolute Return Fund, LP – placed tens of millions of investor funds with Madoff and received annual management fees of 1% of each investor's investment and .2% for administration. As of 2008, the Maxam Defendants represented to their investors that the investors' positions with Madoff were worth in

13

excess of $280 million, and the Maxam Defendants were in a position to receive millions in illicit fees annually pursuant to their illegal scheme.

44.     The Feeder Fund Defendants were well aware – or willfully refused to know – that Madoff's purported investment activity with the investor's funds they sent him – was fraudulent, in that (among other things):

a.     Madoff's investment strategy was inherently impossible to execute. The split-trike conversion strategy he purported to implement would have required him to buy or sell put and call options on any given day in a number greater than the number of put and call options bought or sold in the entire market on those days. In fact, there were not enough put option contracts available to hedge an investment fund the size Madoff was purporting to manage in the way Madoff purported to do so. The Feeder Fund Defendants, who were all sophisticated market professionals (or were managed and controlled by sophisticated market professionals) knew – or willfully refused to know – the inherent impossibility that Madoff could be executing the trades he was reporting.

b.     Madoff reported returns with an abnormal pattern of profitability, both in amount and consistency, that were not credible. Madoff reported annual rates of return on the feeder funds' investments from approximately 10% to 21% from 1996 through 2007. Incredibly, throughout that period, Madoff reported fewer than 15 months with a negative return, even though from January 1996 through December 2007, the S&P 500 had a total of 52 months which generated negative returns, equal to over 36% of the total number of months during that period. Moreover, Madoff's statements reflected

14

a consistent ability over many years to trade stock near their monthly highs and lows to generate consistent and unusual profits. No experienced investment professional could have reasonably believed that such successful trading could have been accomplished legitimately. The Feeder Fund Defendants knew – or willfully refused to know – that Madoff's claimed returns were not lawfully obtained.

c. As part of their management of their feeder funds, the Feeder Fund Defendants monitored Madoff's reported daily trading activity. The monthly account statements that Madoff sent to the Feeder Fund Defendants reflected trades in certain securities on certain dates that were allegedly executed at prices outside the daily range of prices for such securities on the days in question. Certain of the monthly statements reflects trades purchased or sold that were allegedly settled on weekends and/or holidays. These trades were clearly fictitious.

In addition, based on the amount Madoff was managing, his split-strike conversion strategy would have required Madoff to execute huge equity trades on a given day, in purported combinations with huge S&P index call and put options. The account statements sent by Madoff reflected volumes of trades in certain S&P 100 companies that represented unrealistically high portions of the overall trading volume on the New York Stock Exchange of those securities on the specified trade dates. From 1998 to 2008, there were numerous instances where the shares purportedly traded by Madoff for a given stock on a particular day were in excess of 20% of the total market volume. Similarly, the number of purported option purchases Madoff reported on various days was often in excess of the total number of option

15

contracts available on the Chicago Board Options Exchange. The Feeder Fund Defendants knew – or willfully chose not to know – that Madoff's reported trading activity was fictitious and fraudulent.

### C.   The Madoff Family Member Defendants Knowingly Participate in Madoff's Criminal Scheme.

45.   Critical to the continued success and concealment of this illegal activity was Madoff's ability to use BLMIS and MLIS to perpetrate and conceal his illegal conduct. Madoff caused BLMIS to issue sham confirmations and account statements purporting to document his non-existent investment activity for at least thirteen years prior to December 2008 and caused false annual audits of BLMIS to be prepared.

46.   Madoff further utilized MLIS to make it appear that his investment advisory business trading was being undertaken, in part, through MLIS. Madoff laundered money for BLMIS through MLIS, transferring hundreds of millions of dollars between BLMIS and MLIS to make it appear that Madoff's investment advisory business involved trading activity through MLIS. At least tens of millions of dollars of the funds laundered through MLIS were ultimately distributed through BLMIS to the Madoff Family Member Defendants and others.

47.   To enable his criminal scheme to succeed, Madoff needed the cooperation and support of the Madoff Family Member Defendants, who (although not necessarily knowing that Madoff was operating a Ponzi scheme) were aware that Madoff was engaged in fraudulent activity in his operation of the investment advisory business at BLMIS, were further aware that he was using MSIL to facilitate his

fraudulent activity and to launder the proceeds of his fraudulent activity, and intentionally helped Madoff utilized BLMIS and MLIS for such fraudulent purpose n order to receive multi-million dollars of elicit proceeds of Madoff illegal activity.

48.     Each of the Madoff Family Member Defendants held supervisory and managerial positions at BLMIS and/or MLIS and had, *inter alia*, responsibility to insure each entity's compliance with the law.

49.     Each of the Madoff Family Member Defendants was an experienced market professional and had a high level of sophistication in securities trading and financial affairs.

50.     The Madoff Family Member Defendants each knew that Madoff's purported split-strike conversion strategy could not produce the returns that Madoff claimed to be earning on BLMIS' investment advisory business and that his purported trading activity in the BLMIS investment advisory accounts was not occurring in the manner Madoff was claiming.

51.     The Madoff Family Member Defendants each knew that Madoff was engaged in fraudulent activity in BLMIS' investment advisory business and knowingly allowed and helped Madoff perpetrate and conceal his ongoing illegal and fraudulent activity so that they could share in the illicit proceeds of his fraudulent activity.

52.     To help conceal Madoff's criminal activity, the Madoff Family Member Defendants caused false compliance reports to be filed with the Securities & Exchange Commission, concealing Madoff's fraudulent investment advisory business.

17

53.     The Madoff Family Member Defendants participated with Madoff in receiving the illicit proceeds of his illegal and fraudulent activity, directly and indirectly, through their receipt of millions of dollars of distributions of fraudulent "operating profits" of BLMIS, which were nothing more than the illicit proceeds of the fraudulent investment advisory business at BLMIS stolen from Madoff's investment advisory customers; through their receipt of millions of dollars of sham "loans" from Madoff (or Madoff's wife), which were nothing more than distributions of the illicit proceeds of the fraudulent investment advisory business at BLMIS stolen from Madoff's investment advisory customers, designated as loans to avoid taxes and which were never repaid or intended to be repaid; and through their receipt of millions of dollars of fraudulent "returns" on purported (non-existent or otherwise fraudulent) trades in their accounts (or their children's accounts) maintained as part of Madoff's fraudulent investment advisory business at BLMIS, which also were simply proceeds of defendants' criminal scheme stolen from Madoff's investment advisory customers.

54.     Throughout the existence of the criminal scheme described herein (and prior thereto), defendant Peter B. Madoff, who is an attorney, was Senior Managing Director, Director of Trading, and Chief Compliance Officer of BLMIS.

55.     Throughout the existence of the criminal scheme described herein, defendant Peter B. Madoff intentionally utilized his management authority at BLMIS as Senior Managing Director, Director of Trading and Chief Compliance Officer to help further defendants' criminal scheme, intentionally

18

assisting in the use of BLMIS for illegal purposes and enabling Madoff to conceal his illegal misuse of BLMIS, knowing or willfully refusing to know that he was engaging in criminal activity.

56.    Defendant Peter B. Madoff was aware that the purported trading activity and purported returns and profits reported for BLMIS' investment advisory business were false.

57.    Defendant Peter B. Madoff was aware that for years prior to September 2006, Madoff and BLMIS were operating as an investment advisor without properly registering with the SEC.

58.    Throughout the existence of the criminal scheme described herein, defendant Peter B. Madoff knowingly causes BLMIS to submit false compliance reports to the SEC.

59.    Defendant Peter B. Madoff was further aware that BLMIS' financial statements were fraudulent and contained false information concerning BLMIS' holdings, operations, expenses, revenues and profits and knowingly caused such false and fraudulent financial statements to be prepared and disseminated.

60.    Defendant Peter B. Madoff's conduct was undertaken in concert with Madoff, the other Madoff Family Member Defendants and the Feeder Fund Defendants (and others) in order to further defendants' goal of obtaining corrupt monies through illegal investment management activities.

61.    Between 2001 and 2008, defendant Peter B. Madoff received over $20 million in salary and bonus from BLMIS funded by money stolen from BLMIS' investment advisory customers' accounts.  In addition, he received over $3.5 million paid either directly to him or to vendors on his behalf, also stolen from BLMIS' investment advisory customers' accounts.

19

62.     Defendant Peter B. Madoff maintained two investment advisory customer accounts with BLMIS, in which he invested under $33,000 (including less than twenty dollars after December 1995). Defendant Peter B. Madoff withdrew over $16 million from these accounts, an amount he knew was not lawfully produced by actual or legitimate securities transactions.

63.     Defendant Peter B. Madoff did not contribute any money into one of his investment accounts—account number 1M0174. Notwithstanding the lack of actual investment, the March 2002 account statement reflects transactions in Microsoft stock generating a purported gain of $8,752,620. These trades were a fabrication. Despite having no money or securities invested in the account, the investment account suddenly showed that approximately $15.4 million worth of Microsoft stock had been "purchased" in or about December 2000 and "sold" in or about January 2002. The first evidence of this "purchase" of Microsoft stock in the account statements did not appear until March 2002. Less than two months later, in May 2002, defendant Peter B. Madoff withdrew nearly $6 million from this account. The purchase and sale of Microsoft shares reflected on defendant Peter B. Madoff's investment advisory account statements at BLMIS were a fiction to justify his theft of nearly $6 million of BLMIS' investment advisory customers' money.

64.     Between April 2003 and May 2005, defendant Peter B. Madoff withdrew an additional $6.9 million in fictitious profits on fabricated trades in the same account. In September 2005, the account statement was falsely altered to show the "purchase" of 125,000 shares of Apple Computer ("Apple") stock in or about January 2004, more than a year and a half earlier. Although the first

20

evidence of this purported "purchase" did not appear until September 2005, the account statement reflects a stock split settling on March 2, 2005, falsely crediting the account with an additional 125,000 shares of Apple stock. The first evidence of this split does not appear until September 2005. The entire 250,000 shares of Apple stock were purportedly "sold" in or about March 2005. Although the "sale" of Apple stock purportedly occurred in March 2005, the first evidence of this purported "sale" does not appear until September 2005. Defendant Peter B. Madoff's account statements purport to show a gain from these transactions in Apple stock of $8,117,500. Between September 2005 and April 2006, defendant Peter B. Madoff withdrew $3,235,000 of these fictitious profits.

65.     Defendant Peter B. Madoff knew that the amounts withdrawn from his accounts were the product of fictitious trading activity, and that the financial benefits he received were derived from funds stolen from BLMIS' investment advisory customers' accounts. Defendant Peter B. Madoff intentionally received these illicit amounts.

66.     In addition to these withdrawals from his "investment" accounts, defendant Peter B. Madoff—and entities he owned and controlled – knowingly received an additional $20+ million in funds stolen from BLMIS' investment advisory customers, including:

• On December 12, 2007, Bernard Madoff "loaned" defendant Peter B. $9,000,000 at a low interest rate of 4.13%. Although the note was payable to Madoff, personally, the money for the loan came from the operating account for BLMIS's investment advisory business at JP Morgan Chase Bank (the "703 Account"). None of the interest or principal on this purported loan was ever paid by defendant Peter B. Madoff;

21

- On April 14 and June 2, 2004, $4.45 million was wired from the 703 Account to defendant Peter B. Madoff in connection with his purchase of an apartment located at 975 Park Avenue, Apt. 6B, New York, NY;

- In April of 2001, Madoff's wife and defendant Peter B. Madoff's sister-in-law, Ruth Madoff, "loaned" him $4,244,649.30 in connection with the purchase of a home located at 200 NW Algoma Road, Palm Beach, FL 33480.  That money, however, was wired directly to defendant Peter B. Madoff's real estate agents and lawyers from various BLMIS operating accounts.  None of the interest or principal on this purported loan was ever  paid by defendant Peter B. Madoff;

- Between 1996 and 2008, BLMIS paid $1,016,622 (in 38 separate payments) from its account at the Bank of New York to the Peter B. Madoff Life Insurance Trust, funding a life insurance policy which named his family members as beneficiaries;

- Defendant Peter B. Madoff  was an investor in four limited partnerships operated by Sterling American Property, Inc. (the "Sterling Partnerships"). Between January 18, 2000 and April 11, 2006, the Sterling Partnerships received twelve payments totaling at least $896,744 from BLMIS on defendant Peter B. Madoff's behalf;

- Defendant Peter B. Madoff held a 1% ownership stake in Madoff Brokerage Trading and Technology, LLC, which was financed by a $35,000 payment from one of BLMIS's operating accounts;

- Defendant Peter B. Madoff also held a 1% ownership stake in Madoff Technologies, LLC.  On October 31, 2000, his portion of a  capital call by that entity—$54,915.25—was paid by a transfer from one of BLMIS's operating accounts;

- MSIL paid approximately $274,562 out of its operating account (in four separate payments) for the purchase and restoration of defendant Peter B. Madoff's Aston Martin automobile;

22

- Between 2002 and 2008, BLMIS funds were used to pay for $747,046 in personal expenses charged to defendant Peter B. Madoff's American Express cards for personal expenses such as wines and luxury clothing.

67.    All of these financial benefits were provided to defendant Peter B. Madoff from the money stolen, pursuant to defendants' criminal scheme, from customers of Madoff's investment advisory business at BLMIS.

68.    Defendant Peter B. Madoff knew that the financial benefits described above were all the proceeds of fraudulent activity and were stolen from customers of Madoff's investment advisory business at BLMIS, and knowingly facilitated Madoff's use of BLMIS and MLIS to enable the fraudulent activity to continue and conceal the existence of such activity.

69.    Defendant Mark D. Madoff worked at BLMIS from 1986 through December 2008 and served as a FINRA-registered securities principal of BLMIS, with supervisory responsibilities to ensure compliance with BLMIS's policies and procedures, as well as with federal securities laws.  For a number of years prior to December 2008, he held the position of Co-Director of Trading at BLMIS and managed the firm's proprietary trading desk and its market-making operations.  He also held supervisory positions at MLIS as Controller and Director at MLIS and had responsibility for MLIS' compliance with applicable laws and knowledge of MLIS' actual trading activity.

70.    Defendant Mark D. Madoff was aware that the purported trading activity and purported returns and profits for BLMIS' investment advisory business were false.

23

71.    Defendant Mark D. Madoff was aware that for years prior to September 2006, Madoff and BLMIS were operating as an investment advisor without properly registering with the SEC.

72.    Defendant Mark D. Madoff was further aware that through December 2008, BLMIS was submitting false compliance reports to the SEC.

73.    Defendant Mark D. Madoff was further aware that BLMIS' financial statements were fraudulent and contained false information concerning BLMIS' holdings, operations, expenses, revenues and profits.

74.    Defendant Mark D. Madoff's conduct was undertaken in concert with Madoff, the other Madoff Family Member Defendants and the Feeder Fund Defendants (and others) in order to further defendants' goal of obtaining corrupt monies through illegal investment management activities.

75.    Like his uncle, defendant Mark D. Madoff received enormous sums of money stolen from BLMIS' investment advisory customers pursuant to defendants' criminal scheme, totaling in excess of $66 million.  Between 2001 and 2008, he received over $29 million in purported compensation from BLMIS derived from such stolen funds, including bonuses of $4.8 million in 2006 and over $9 million in 2007.

76.    Like his uncle, defendant Mark D. Madoff also received millions of dollars in stolen funds through fictitious trading activity in his (and his children's) investment advisory accounts at BLMIS.  Defendant Mark D. Madoff maintained seven customer accounts with BLMIS' investment advisory business for himself and his family members.  Defendant Mark D. Madoff invested under

24

$750,000 into those accounts, but was able to withdraw over $18 million from the accounts prior to December 2008, an amount he knew was not lawfully produced by actual securities transactions.

77.     One of defendant Mark D. Madoff's accounts—1M0142—was purportedly opened in July 1998.  Although defendant Mark D. Madoff invested no money into that account, he withdrew over $14 million from that account alone as a result of fictitious transactions in the account.  In July 1998, almost immediately after the account was opened, the  account statement purported to show that thousands of shares of Dell Computer Corporation ("Dell") stock had been purchased in or about January 1997, more than eighteen months before the account was opened.  These purchases occurred even though the account was never funded with cash or securities.  In July 1998, the account statement suddenly reflects two stock splits in Dell: one settling on July 30, 1997, and another settling on March 11, 1998.  Both of these splits took place after the shares were purportedly purchased, but before the account was opened.  A July 21, 1998 entry on the account statement shows that the Dell shares were purportedly "sold," generating a "gain" of $1,985,000.  Three days later, on or about July 24, 1998, $1,956,205 was withdrawn from this account.

78.     Similarly, the March 2002 account statement suddenly (and fictitiously) reflects that $9.9 million worth of stock in Microsoft had been "purchased" over a year earlier in or about December 2000 and then "sold" in or about January 2002 creating a purported profit of $5,628,860.  Despite the earlier dates of these purported trades, the first evidence of this "purchase" of Microsoft stock does not appear until March 2002.  On or about April 3, 2002, over $5.3 million of the purported profits from these

25

fictitious transactions was withdrawn from defendant Mark D. Madoff's account and transferred to an outside account owned and controlled by him.

79.    Similarly, in April 2004, despite having no money or securities invested in his account, an account statement shows that more than 2.9 million shares of stock in Lucent Technologies had been "purchased" in March 2003 and "sold" in April 2004 for a gain of over $7.5 million. Again, although these trades purportedly occurred in 2003, they do not appear in account statements until April 2004. At least $7.3 million of the proceeds of these fictitious trades were withdrawn and transferred to outside bank and brokerage accounts controlled by defendant Mark D. Madoff.

80.    Defendant Mark D. Madoff also established a customer account in July 1998 in the name of the "Children of Mark D. Madoff" with account number 1M0143, with defendant Andrew H. Madoff, defendant Mark D. Madoff' brother, as trustee. Although no money was ever invested in the account, in July 1998, the fraudulent transactions in Dell stock described above were repeated in the investment account held in trust for defendant Mark D. Madoff's children. Falsified purchases, splits, and sales of Dell stock purported to take place in the account in 1997 and 1998, generating fictitious gains of $1,985,000. Just a few days after the alleged sale, on or about July 24, 1998, $1,956,205 was withdrawn from this account.

81.    Defendant Mark D. Madoff knew that the amounts withdrawn from his and his children's accounts were the product of fictitious trading activity, and that the financial benefits he (and his

26

children) received were derived from funds stolen from BLMIS' investment advisory customers' accounts. Defendant Mark D. Madoff intentionally received these illicit amounts.

82.    In addition to his sizeable compensation and the fabricated returns on his investment accounts, defendant Mark D. Madoff received over $20 million in other funds stolen from BLMIS' investment advisory customers' accounts, including:

- In May and June of 2008, $6,645,000 was transferred from the 703 Account directly to defendant Mark D. Madoff's real estate attorney for the purchase of a home located at 51 Wanoma Way, Nantucket, MA 02554. Although this transfer took the form of a purported "loan" with a 3.2% interest rate, none of the interest or principal on this purported loan was ever paid by defendant Mark D. Madoff;

- In June 2005, defendant Mark D. Madoff's mother, Ruth Madoff, purported to loan him $5,556,589 in connection with the purchase of an apartment located at 583 Broadway, Apt. 4M, New York, NY 10021. Those funds, however, originated from the 703 Account. None of the interest or principal on this purported loan was ever paid by defendant Mark D. Madoff;

- In March 2004, Ruth Madoff had purported to loan him $2,925,000 to purchase another Manhattan apartment. Once again, however, the money originated from BLMIS' 703 Account, and none of the interest or principal on this purported loan was ever paid by defendant Mark D. Madoff;

- In February 2001, BLMIS sent four checks from its operating accounts totaling $1,232,680 to fund defendant Mark D. Madoff's purchase of an apartment on Manhattan's Upper East Side;

- In 2000, defendant Mark D. Madoff purchased a $2,242,500 home located at 21 Cherry Valley Road, Greenwich, CT 06831. Although it is likely that this amount was funded directly from BLMIS's operating

27

accounts, these payments were documented as a purported "loan" from his mother. None of the interest or principal on this purported loan was ever paid by defendant Mark D. Madoff;

- Defendant Mark D. Madoff held a 22.275% ownership stake in Madoff Brokerage Trading and Technology, LLC, which was financed by a $779,625 payment from one of BLMIS's operating accounts;

- BLMIS funds were used to pay for $797,113 in personal expenses charged to defendant Mark D. Madoff's American Express card between 2002 and 2008.

83.   All of these financial benefits were provided to defendant Mark D. Madoff from the money stolen, pursuant to defendants' criminal scheme, from customers of Madoff's investment advisory business at BLMIS.

84.   Defendant Mark D. Madoff knew that the financial benefits described above were all the proceeds of fraudulent activity and were stolen from customers of Madoff's investment advisory business at BLMIS, and knowingly facilitated Madoff's use of BLMIS and MLIS to enable the fraudulent activity to continue and conceal the existence of such activity.

85.   Defendant Andrew H. Madoff worked at BLMIS from 1988 through December 2008 and served as a FINRA-registered securities principal of BLMIS, with supervisory responsibilities to ensure compliance with BLMIS's policies and procedures, as well as with federal securities laws. For a number of years prior to December 2008, he held the position of Co-Director of Trading at BLMIS and managed the firm's trading floor and directed a number of audit and compliance projects for BLMIS, including the confirmation and reporting of trades. He also held supervisory positions at MLIS as Controller and

Director at MLIS and had responsibility for MLIS' compliance with applicable laws and knowledge of MLIS' actual trading activity.

86.    Defendant Andrew H. Madoff was aware that the purported trading activity and purported returns and profits for BLMIS's investment advisory business were false.

87.    Defendant Andrew H. Madoff was aware that for years prior to September 2006, Madoff and BLMIS were operating as an investment advisor without properly registering with the SEC.

88.    Defendant Andrew H. Madoff was further aware that through December 2008, BLMIS was submitting false compliance reports to the SEC.

89.    Defendant Andrew H. Madoff was further aware that BLMIS' financial statements were fraudulent and contained false information concerning BLMIS' holdings, operations, expenses, revenues and profits.

90.    Defendant Andrew H. Madoff's conduct was undertaken in concert with Madoff, the other Madoff Family Member Defendants and the Feeder Fund Defendants (and others) in order to further defendants' goal of obtaining corrupt monies through illegal investment management activities.

91.    Like his brother, defendant Andrew H. Madoff received over $60 million stolen from BLMIS' investment advisory customers pursuant to defendants' criminal scheme.  Between 2001 and 2008, he was paid over $31 million in salary and bonus.  His compensation included bonuses of over $4.8 million in 2006, and over $9 million in 2007, alone.

29

92.     Like his brother, defendant Andrew H. Madoff maintained investment advisory accounts at BLMIS, including seven accounts in his own name.  Although he invested under $925,000 into those accounts, he was able prior to December 2008 to withdraw over $17 million, an amount he knew was not lawfully produced by actual securities transactions.   Most, but not all, of defendant Andrew H. Madoff's fictitious account gains were withdrawn from customer account number 1M0140.  Although defendant Andrew H. Madoff invested no money into this account, he withdrew over $14.5 million between 1998 and November 2008.

93.     As with his uncle's and brother's accounts, defendant Andrew H. Madoff's investment advisory account statements reflect fabricated transactions.  In July 1998, almost immediately after the account was opened, the account statement purported to show that thousands of shares of Dell Computer Corporation stock had been purchased in or about January 1997, more than eighteen months before the account was opened.  These purchases occurred even though the account was never funded with cash or securities.  In July 1998, the account statements suddenly reflected two stock splits: one settling on July 30, 1997, and another on March 11, 1998, after the shares were purportedly purchased, but before the account was purportedly opened.  A July 21, 1998 entry on the account statement shows that the Dell shares were purportedly "sold," generating a gain of $1,985,000.  Three days later, on or about July 24, 1998, $1,956,205 was withdrawn from this account.

94.     As of a few years later, defendant Andrew H. Madoff had still not invested money or securities into this account.  Yet, in March 2002, his account statement suddenly reflects that $9.9

million worth of stock in Microsoft had been "purchased" over a year earlier in or about December 2000 and "sold" in or about January 2002, at a tidy profit of $5,628,860. Despite the earlier dates of these purported trades, the first evidence of this "purchase" of Microsoft stock does not appear until March 2002. On or about April 3, 2002, defendant Andrew H. Madoff withdrew over $5 million of these fictitious profits from the account.

95.     Similarly, in April 2004, again despite not having invested money or securities into his account, an account statement purported to show that more than 2.9 million shares of stock in Lucent Technologies had been "purchased" in March 2003 and "sold" in April 2004 for a gain of over $7.5 million. Although the first of these transactions purportedly took place in 2003, the first evidence of this "purchase" of Lucent stock does not appear on an account statement until April 2004. At least $7.3 million of the fictitious proceeds of these fabricated trades were transferred to bank and brokerage accounts controlled by defendant Andrew H. Madoff.

96.     Another account, number 1M0141, was opened in July 1998 in the name of the "Children of Andrew H. Madoff," with defendant Mark D. Madoff as trustee. No money was ever invested into this account. In July 1998, fraudulent transactions in Dell stock identical to those described above appeared in statements for this account. Falsified purchases, splits, and sales of Dell stock purporting to take place in 1997 and 1998, before the account was opened generated fictitious gains of $1,985,000. Just a few days after the alleged sale, on or about July 24, 1998, $1,956,205 was withdrawn from this account.

97.    Defendant Andrew H. Madoff knew that the amounts withdrawn from his and his children's accounts were the product of fictitious trading activity, and that the financial benefits he (and his children) received were derived from funds stolen from BLMIS' investment advisory customers' accounts.  Defendant Andrew H. Madoff intentionally received these illicit amounts.

98.    In addition to his sizeable compensation and the fabricated returns on his investment accounts, defendant Andrew H. Madoff improperly received over $20 million in other funds stolen from BLMIS' investment advisory customers' accounts, including:

- In 2008, Bernard Madoff purported to "loan" defendant Andrew H. Madoff  $4,485,000 for the purchase of an apartment located at 433 E. 74th Street, Apt. 5E, New York, NY 10021.  That money, however, was wired directly to defendant Andrew H. Madoff's real estate agents and lawyers from the 703 Account.  None of the interest or principal on this purported loan was ever paid by defendant Andrew H. Madoff;

- On November 25, 2003, Ruth Madoff purported to "loan" defendant Andrew H. Madoff $6.8 million to purchase another apartment located at 10 Gracie Square, Apt. 10G, New York, NY.  That money, however, originated from the 703 Account. None of the interest or principal on this purported loan was ever paid by defendant Andrew H. Madoff;

- Defendant Andrew H. Madoff held a 22.275% ownership stake in Madoff Brokerage Trading and Technology, LLC, which was financed by a $779,625 payment from one of BLMIS's operating accounts;

- Defendant Andrew H. Madoffs $300,000 interest in a business called Blow Styling Salon, LLC was funded with transfers from the 703 Account in May and September of 2008;

- Between 2002 and 2008, BLMIS funds were used to pay for over $950,000 of defendant Andrew H. Madoff's personal including the

32

down payment on a boat, mooring fees, and personal expenses charged to his American Express card such as clothes, boat rentals, and vacation travel for his wife and daughters.

99.     All of these financial benefits were provided to defendant Andrew H. Madoff from the money stolen, pursuant to defendants' criminal scheme, from customers of Madoff's investment advisory business at BLMIS.

100.    Defendant Andrew H. Madoff knew that the financial benefits described above were all the proceeds of fraudulent activity and were stolen from customers of Madoff's investment advisory business at BLMIS, and knowingly facilitated Madoff's use of BLMIS and MLIS to enable the fraudulent activity to continue and conceal the existence of such activity.

**D.      Defendants Manzke and Maxam Capital Solicit the Plaintiff Plans.**

101.    In furtherance of their role in their illegal scheme with Madoff, the Feeder Fund Defendants engaged through December 2008 in a continuing solicitation of investments into their hedge funds through offering and selling on the basis of the fraudulent statements of material facts and omissions described above limited partnership interests in their hedge funds to individuals, charities, pension funds and retirement accounts, institutions and other entities, including other hedge funds, and provided the funds to Madoff to manage.

102.    In or about April 2005, defendant Manzke formed defendant Maxam Capital.  Defendant Manzke caused defendant Maxam Capital to form a new limited partnership hedge fund, the Maxam

33

Absolute Return Fund, L.P. [the "Maxam Feeder Fund"], for the purpose of creating a new pool of investments for Madoff and a new source of fees for herself and her partners.

103.   Although the Maxam Defendants intended, from the outset of their formation of the Maxam Feeder Fund, for Madoff to serve as investment manager of the fund, defendant Manzke caused defendant Maxam Capital to falsely represent that it would serve as (and was) the investment manager for the Maxam Feeder Fund and to charge and receive annual fees for its purported investment management services.  Another entity formed by defendant Manzke, defendant Maxam Capital GP, served as general partner of the new MAXAM Feeder Fund, and yet another Maxam entity formed by defendant Manzke, defendant Maxam Capital Management, served as administrator of the Maxam Feeder Fund.  Each of these Maxam entities received fees, paid directly or indirectly by the Maxam Feeder Fund's investors, for its services on behalf of the MAXAM Feeder Fund.  Investors in the Maxam Feeder Fund were required to agree to the payment of these fees based on each investor's pro rata partnership interest in the Maxam Feeder Fund.

104.   Subsequent to July 2006, in furtherance of their role in their illegal scheme with Madoff, defendant Manzke and the other Maxam Defendants solicited the plaintiff Plans to purchase limited partnership interests in the Maxam Feeder Fund.

105.   The conduct of defendant Manzke in forming Maxam Capital and the other Maxam Defendants and the Maxam Feeder Fund, and the conduct of the Maxam Defendants in marketing the Maxam Feeder Fund as aforesaid and their solicitation of the plaintiff Plans to purchase limited

34

partnership interests in the Maxam Feeder Fund, was undertaken in concert with Madoff and the other defendants in this action pursuant to their criminal scheme in order to further defendants' goal of obtaining corrupt monies through illegal investment management activities.

106. Defendant Manzke had, from 1985 through April 2005, been an officer and director of Tremont Partners, Inc. ("Tremont"), the plaintiff Plans' pension investment advisor throughout that period.

107. In furtherance of her illegal scheme with Madoff and the other defendants, defendant Manzke had, while an officer and director of Tremont, helped to create and market a feeder fund limited partnership investment vehicle to send money to Madoff (the "Tremont Feeder Fund") managed by Tremont.

108. In the late 1990's, defendant Manzke – in her role as the plaintiff Plans' pension investment advisor – had recommended to the plaintiff Plans that they purchase a limited partnership interest in the Tremont Feeder Fund.

109. At the time she solicited the plaintiff Plans to purchase a limited partnership interest in the Tremont Feeder Fund, defendant Manzke falsely represented to the plaintiff Plans that Madoff had for years achieved, and was continuing to achieve, consistent annual returns in the range of 8-12% (with positive monthly returns in virtually every month) on the monies he was managing through use of a so-called "split-strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase

35

of out-of-the-money puts on the S&P 100 Index.  Defendant Manzke further represented to the plaintiff Plans that, through use of this strategy, Madoff could limit losses when stock prices decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

110.    At the time she solicited the plaintiff Plans to purchase a limited partnership interest in the Tremont Feeder Fund, defendant Manzke knew – but did not advise the plaintiff Plans – that Madoff's purported split-strike conversion strategy could not produce consistent annual returns of 8-12% in up and down markets (and that it was impossible for Madoff to have obtained positive monthly returns in virtually every month); she knew that other market professionals had attempted to implement a similar split-strike conversion strategy, but that no other market professionals had ever been able to replicate Madoff's claimed continuing success through such strategy; she knew that the claimed volume in options trading that would have had to exist if Madoff was, in fact, following such strategy did not exist; and she knew that the claimed trades in S&P 100 securities that would have been reported if Madoff was, in fact, following such strategy, did not exist.

111.    At the time she solicited the plaintiff Plans to purchase a limited partnership interest in the Tremont Feeder Fund, defendant Manzke knew – but did not advise the plaintiff Plans – that Madoff could not legally obtain the consistent annual results he reported and believed that he was taking advantage of insider trading information derived from BLMIS or engaged in some other form of illegal trading activity to illegally achieve such results.

36

112.   Defendant Manzke did not advise the plaintiff Plans when she solicited their purchase of limited partnership interests in the Tremont Feeder Fund that Madoff's reported investment returns could not reasonably be produced by his purported split-strike conversion strategy or that she believed he was trading illegally to obtain the purported returns, even though such information was material to the plaintiff Plans' decision whether or not to purchase the Tremont Feeder Fund limited partnership offerings.

113.   In June 1997, relying on defendant Manzke's false statements and omissions, the plaintiff Plans purchased a limited partnership interest in the Tremont Feeder Fund.

114.   At various times subsequent to 1997 and prior to April 2005, defendant Manzke solicited the plaintiff Plans to purchase additional limited partnership interests in the Tremont Feeder Fund, always touting the success of Madoff's split-strike conversion strategy all the while knowing, but not advising the plaintiff Plans, that such strategy could not reasonably be producing the returns Madoff was reporting and that it was likely that Madoff was engaged in some form of illegal trading activity.

115.   At various times subsequent to 1997, the plaintiff Plans, relying on defendant Manzke's false statements and omissions, purchased additional limited partnership interests in the Tremont Feeder Fund.

116.   From 1997 through 2007, the plaintiff Plans maintained a partnership interest in the Tremont Feeder Fund, which defendant Manzke and Tremont represented to them had a value as of June 30, in 2007 in excess of $37 million.

117.    Subsequent to July 2006, defendant Manzke, acting on behalf of the other Maxam Defendants, approached the plaintiff Plans to solicit them to withdraw their investment in the Tremont Feeder Fund and purchase a limited partnership interest in the Maxam Feeder Fund.

118.    In the course of her efforts to convince the plaintiff Plans to purchase a limited partnership interest in the Maxam Feeder Fund, defendant Manzke took advantage of the long-term personal relationship she had formed with the plaintiff Plans while serving as their pension investment adviser, knowing that the plaintiff Plans relied upon her superior knowledge and reposed their trust and confidence in her investment advice.

119.    In the course of her efforts to convince the plaintiff Plans to purchase a limited partnership interest in the Maxam Feeder Fund, defendant Manzke, acting on behalf of the other Maxam Defendants, advised the Plans that her new hedge fund would, like the Tremont Feeder Fund, place all of its invested funds with Madoff.  In support of their solicitation, defendant Manzke and the other Maxam Defendants prepared and distributed documents to the Plans citing Madoff's performance results from 1997 through 2006 and further citing Madoff's purported split-strike conversion strategy as the basis for the purported performance results.  As an inducement to cause the plaintiff Plans to switch their investments from the Tremont Feeder Fund to the Maxam Feeder Fund, defendant Manzke and the other Maxam Defendants offered to charge the Plans lower fees than the Tremont Feeder Fund was charging.

38

120.    At the time they solicited the plaintiff Plans to purchase a limited partnership interest in the Maxam Feeder Fund, defendant Manzke and the other Maxam Defendants knew – but did not advise the plaintiff Plans – that Madoff's purported split-strike conversion strategy could not produce consistent annual returns of 8-12% in up and down markets (and that it was impossible for Madoff to have obtained positive monthly returns in virtually every month); knew that other market professionals had attempted to implement a similar split-strike conversion strategy, but that no other market professionals had ever been able to replicate Madoff's claimed continuing success through such strategy; knew that the claimed volume in options trading that would have had to exist if Madoff was, in fact, following such strategy did not exist; and knew that the claimed trades in S&P 100 securities that would have been reported if Madoff was, in fact, following such strategy, did not exist.

121.    At the time they solicited the plaintiff Plans to purchase a limited partnership interest in the Maxam Feeder Fund, defendant Manzke and the other Maxam Defendants knew – but did not advise the plaintiff Plans – that Madoff could not legally obtain the consistent annual results he reported and believed that he was taking advantage of insider trading information derived from BLMIS or engaged in some other form of illegal trading activity to illegally achieve such results.

122.    Defendant Manzke and the other Maxam Defendants did not advise the plaintiff Plans when they solicited the Plans' purchase of limited partnership interests in the Maxam Feeder Fund that Madoff's reported investment returns could not reasonably be produced by his purported split-strike conversion strategy or that the Maxam Defendants believed he was trading illegally to obtain the

39

purported returns, even though such information was material to the plaintiff Plans' decision whether or not to purchase the Maxam Feeder Fund limited partnership offerings.

123.    The plaintiff Plans relied on the fraudulent representations and omissions about Madoff's performance from 1996 through 2007 by defendant Manzke and the other Maxam Defendants and were fraudulently induced to purchase a limited partnership interest in the Maxam Feeder Fund.

124.    On or about July 3, 2007, in reliance on the material false statements and omissions by defendant Manzke and the other Maxam Defendants, the plaintiff Plans purchased a $30 million limited partnership interest in the Maxam Feeder Fund

125.    In and after July 2007, defendant Manzke and the other Maxam Defendants continued to represent falsely to the plaintiff Plans that Madoff was producing positive investment results for the Maxam Feeder Fund through use of the split-strike conversion strategy, when, in fact, the Maxam Defendants knew that the split-strike conversion strategy could not, in and of itself, produce the results reported by Madoff and believed that Madoff was engaging in illegal trading to achieve these results.

126.    On or about January 3, 2008, in reliance on defendant Manzke's and the other Maxam defendants' material false statements and omissions, the plaintiff Plans purchased an additional $7,443,175.43 limited partnership interest in the Maxam Feeder Fund.

127.    On December 3, 2008, the Maxam Defendants provided the plaintiff Plans with an Investor Statement reporting that the Plan's capital investment in the Maxam Fund had a value of $41,885,901.22 as of November 30, 2008.  This amount consisted of the Plans' principal investments

40

into the Maxam Fund of $37,443,675 and of $3.8+ million in appreciation that Maxam Capital reported the Plans' investments had earned as of November 30, 2008.

### E.    The Fairfield Greenwich Group Defendants Further the Criminal Scheme.

128.    In furtherance of their role in defendants' criminal scheme, the Fairfield Greenwich Group Defendants from the early 1990's to December 2008 solicited billions of dollars of investments in feeder fund limited partnership interests and other investment vehicles from investors and hedge funds and placed such funds under the management of Madoff, obtaining for themselves hundreds of millions of dollars in corrupt monies.

129.    Through such solicitations, between December 1, 1995 and December 2008, the Fairfield Greenwich Group obtained and sent to Madoff over $4.5 billion for his illegal management and to reap their illegal corrupt fees.

130.    The Fairfield Greenwich Group Defendants' conduct in soliciting such investments and placing such monies with Madoff for management was necessary to enable defendants' criminal scheme to succeed, including that part of the scheme implemented by the Maxam Defendants through their offering and sale of limited partnership interests in the Maxam Feeder Fund, and to prevent discovery of defendants' illegal scheme.

131.    The Fairfield Greenwich Group Defendants' conduct was undertaken in concert with Madoff and the other defendants in this action in order to further defendants' goal of obtaining corrupt monies through illegal investment management activities.

41

132.    During the 1990's, 2000's and through December 2008, the Fairfield Greenwich Group Defendants falsely represented to investors in its feeder funds and other investment vehicles and in public statements that Madoff was continuing to post successful annual investment returns in the range of 10% through use of his purported split-strike conversion strategy.

133.    Such representations, which the Fairfield Greenwich Group Defendants knew – or wrongfully refused to know – to be false, were necessary to enable the Feeder Fund Defendants to continue to raise huge sums of money to be placed with Madoff, to enable the criminal scheme to succeed, and to prevent discovery of defendants' illegal scheme with Madoff.

**F.    Madoff's Ponzi Scheme is Exposed.**

134.    In December 2008, with Madoff's arrest as described above, plaintiffs learned that Madoff had, for years, operated a Ponzi scheme and that they had purchased worthless partnership interests in the Maxam Feeder Fund in 2007 and 2008.

135.    Plaintiffs further learned that they had paid unwarranted fees to the Maxam Defendants.

42

## II.   CLAIMS FOR RELIEF

### A.   First Count:   (Violation of the Connecticut Uniform Securities Act — as to Defendant Maxam Capital)

1. - 135.  Paragraphs 1 through 135 of this Complaint are incorporated as paragraphs 1 through 135 of the First Count.

136.   At all times relevant to plaintiffs' claims, defendant Maxam Capital was a registered investment adviser and was in the business of advising others, for compensation, as to the value of securities or the advisability of investing in, purchasing or selling securities, including recommending investments in private placement investment opportunities, and of issuing analyses and reports concerning securities.

137.   In connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid, defendant Maxam Capital made untrue statements of material fact to the plaintiff Plans and omitted to state material facts to the plaintiff Plans necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138.   Defendant Maxam Capital knew or should have known of such untruths or omissions in connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid.

43

139.    In connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid, defendant Maxam Capital employed a device, scheme or artifice to defraud and engaged in acts, practices or a course of business that operated as a fraud and deceit upon the plaintiff Plans.

140.    The plaintiff Plans were induced to purchase limited partnership interests in the Maxam Feeder Fund, as described above, as a results of defendant Maxam Capital's scheme to defraud and acts of fraud and deceit.

141.    Defendant Maxam Capital is liable to the plaintiff Plans pursuant to Gen. Stats. § 36b-29(a)(2) and (b)(1), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

**B.    Second Count:** (Violation of the Connecticut Uniform Securities Act – as to Defendant Manzke)

1. - 141.  Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Second Count.

142.    At all times mentioned herein, defendant Manzke was the Chairman and Chief Executive Officer of defendant Maxam Capital and directly or indirectly controlled the actions of defendant Maxam Capital in connection with the offering of sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

44

143.   Defendant Manzke personally participated in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans and made untrue statements of material fact to the plaintiff Plans and omitted to state material facts to the plaintiff Plans necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.   Defendant Manzke materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans and in making untrue statements of material fact to the plaintiff Plans and in omitting to state material facts to the plaintiff Plans necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145.   Defendant Manzke knew or should have known of such untruths or omissions in connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid.

146.   In connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid, defendant Manzke employed a device, scheme or artifice to defraud and engaged in acts, practices or a course of business that operated as a fraud and deceit upon the plaintiff Plans.

147.    In connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid, defendant Manzke caused defendant Maxam Capital to employ a device, scheme or artifice to defraud and to engage in acts, practices or a course of business that operated as a fraud and deceit upon the plaintiff Plans.

148.    In connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid, defendant Manzke materially assisted defendant Maxam Capital to employ a device, scheme or artifice to defraud and to engage in acts, practices or a course of business that operated as a fraud and deceit upon the plaintiff Plans.

149.    At all times mentioned herein, defendant Manzke directly or indirectly controlled the actions of defendants Maxam Capital GP and Maxam Capital Management, served as a partner, officer or director of defendants Maxam Capital GP and Maxam Capital Management, and/or was employed by or served as the agent of defendants Maxam Capital GP and Maxam Capital Management, which materially assisted defendant Maxam Capital in the offering of sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

150.    Defendant Manzke is liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2), (b)(1) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

46

**C.**   **Third Count:**   (Violation of the Connecticut Uniform Securities Act –
as to Defendants Maxam Capital GP and Maxam Capital
Management)

1. - 141.   Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Third Count.

142.   Defendants Maxam Capital GP and Maxam Capital Management materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans and in making untrue statements of material fact to the plaintiff Plans and in omitting to state material facts to the plaintiff Plans necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

143.   Defendants Maxam Capital GP and Maxam Capital Management knew or should have known of such untruths or omissions in connection with the offer and sale to the plaintiff Plans of limited partnership interests in the Maxam Feeder Fund, as aforesaid.

144.   Defendants Maxam Capital GP and Maxam Capital Management are liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2), (b)(1) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

47

**D.**   **Fourth Count:**  (Violation of the Connecticut Uniform Securities Act –
as to Defendant Noel)

1. - 141.  Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Fourth Count.

142.   Defendant Walter M. Noel, Jr. materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

143.   Fairfield Sentry and other hedge funds and investment vehicles created and owned by Fairfield Greenwich Group materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans, and defendant Noel directly or indirectly controlled such entities, served as a partner, officer or director of such entities, and/or was employed by or served as the agent of such entities.

144.   Defendant Noel is liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

**E.**    **Fifth Count:**   (Violation of the Connecticut Uniform Securities Act –
as to Defendant Tucker)

1. - 141.   Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Fifth Count.

142.   Defendant Jeffrey H. Tucker and persons and entities affiliated with the Fairfield Greenwich Group directly or indirectly controlled by him materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

143.   Fairfield Sentry and other hedge funds and investment vehicles created and owned by Fairfield Greenwich Group materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans, and defendant Tucker directly or indirectly controlled such entities, served as a partner, officer or director of such entities, and/or was employed by or served as the agent of such entities.

144.   Defendant Tucker is liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

49

F.   <u>Sixth Count:</u>   (Violation of the Connecticut Uniform Securities Act – as to Defendant Peter B. Madoff)

1. - 141.  Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Sixth Count.

142.   Defendant Peter B. Madoff materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

143.   Madoff, BLMIS and MLIS materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans, and defendant Peter B. Madoff directly or indirectly controlled Madoff, BLMIS and MLIS, served as a partner, officer or director of Madoff, BLMIS and MLIS, and/or was employed by or served as the agent of Madoff, BLMIS or MLIS.

144.   Defendant Peter B. Madoff is liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

G.     **Seventh Count:**  (Violation of the Connecticut Uniform Securities Act –
as to Defendant Mark D. Madoff)

1. - 141.  Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Seventh Count.

142.    Defendant Mark D. Madoff materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

143.    Madoff, BLMIS and MLIS materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans, and defendant Mark D. Madoff directly or indirectly controlled Madoff, BLMIS and MLIS, served as a partner, officer or director of Madoff, BLMIS and MLIS, and/or was employed by or served as the agent of Madoff, BLMIS or MLIS.

144.    Defendant Mark D. Madoff is liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

51

**H.**   **Eighth Count:**   **(Violation of the Connecticut Uniform Securities Act –**
                        **as to Defendant Andrew H. Madoff)**

1. - 141.   Paragraphs 1 through 141 of the First Count are incorporated as paragraphs 1 through 141 of the Eighth Count.

142.   Defendant Andrew H. Madoff materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans.

143.   Madoff, BLMIS and MLIS materially assisted defendant Maxam Capital in the offering and sale of limited partnership interests in the Maxam Feeder Fund to the plaintiff Plans, and defendant Andrew H. Madoff directly or indirectly controlled Madoff, BLMIS and MLIS, served as a partner, officer or director of Madoff, BLMIS and MLIS, and/or was employed by or served as the agent of Madoff, BLMIS or MLIS.

144.   Defendant Andrew H. Madoff is liable to the plaintiff Plans, pursuant to Gen. Stats. §§ 36b-29(a)(2) & (c), to repay the full consideration paid by the plaintiff Plans for the limited partnership interests purchased in the Maxam Feeder Fund by the plaintiff Plans, together with statutory interest and attorneys' fees.

I.   **Ninth Count:**   **(Concerted action to commit theft and aiding and abetting theft – as to Maxam Defendants)**

1. - 135.  Paragraphs 1 through 135 of the First Count are incorporated as paragraphs 1 through 135 of the Ninth Count.

136.   The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the fraudulent and illegal conduct of the Maxam Defendants described above, acting in concert with and pursuant to a common design with Madoff, the other Feeder Fund Defendants and the Madoff Family Member Defendants and others.

137.   The Maxam Defendants knew that Madoff was acting in breach of his duty to persons who retained him as their investment manager and that the other Feeder Funds Defendants were acting in breach of their duty to persons who invested in Feeder Funds operated by the other Feeder Funds Defendants.

138.   Through their fraudulent and illegal conduct described above, the Maxam Defendants rendered substantial assistance and encouragement to Madoff and the other Feeder Funds Defendants in that the Maxam Defendants provided necessary funding to enable the criminal scheme to continue and to facilitate the continued concealment of the existence of the criminal scheme and in that they intentionally did not disclose the fraudulent nature of Madoff's trading activity, even though they had a duty to do so.

53

139.    Through their fraudulent and illegal conduct described above, the Maxam Defendants –
acting in breach of their duty to plaintiffs – rendered substantial assistance and encouragement to
Madoff, the other Feeder Funds Defendants and the Madoff Family Member Defendants in that the
Maxam Defendants provided necessary funding to enable the criminal scheme to continue and to
facilitate the continued concealment of the existence of the criminal scheme and in that they
intentionally did not disclose the fraudulent nature of Madoff's trading activity, even though they had a
duty to do so.

140.    The conduct of the Maxam Defendants as aforesaid was wanton and willful and
undertaken in knowing violation of the law, to enable them, and Madoff, the other Feeder Fund
Defendants and the Madoff Family Member Defendants and others, to reap enormous illegal monies that
they would not otherwise have been entitled to receive.

141.    Plaintiffs are entitled to recover compensatory damages for their actual losses, common
law punitive damages and statutory damages pursuant to Gen. Stats. § 52-564 from the Maxam
Defendants on account of their intentional and knowing participation in the theft of the plaintiff Plans'
funds.

54

**J.     Tenth Count:   (Concerted action to commit theft and aiding and abetting theft –
                        as to Defendant Noel)**

1. - 139.  Paragraphs 1 through 139 of the Ninth Count are incorporated as paragraphs 1 through
139 of the Tenth Count.

140.    The plaintiff Plans' lost investments, lost investment opportunities and losses from
payment of unwarranted fees were caused by the fraudulent and illegal conduct of defendant Noel
described above, acting in concert with and pursuant to a common design with Madoff, the other Feeder
Fund Defendants and the Madoff Family Member Defendants and others.

141.    Defendant Noel knew that Madoff was acting in breach of his duty to persons
who retained him as their investment manager and that the other Feeder Funds Defendants were acting in
breach of their duty to persons who invested in Feeder Funds operated by the other Feeder Funds
Defendants.

142.    Through his fraudulent and illegal conduct described above, defendant Noel rendered
substantial assistance and encouragement to Madoff and the other Feeder Funds Defendants in that
defendant Noel helped obtain necessary funding to enable the criminal scheme to continue and to
facilitate the continued concealment of the existence of the criminal scheme and in that he intentionally
did not disclose the fraudulent nature of Madoff's trading activity, even though he had a duty to do so.

143.   Defendant Noel, knowing that the Maxam Defendants were engaged in the unlawful solicitation of investments through the use of misrepresentations and pursuant to fraudulent scheme, in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by facilitating the concealment of their illegal conduct and by promoting the success of investments with Madoff and Madoff Feeder Funds.

144.   Defendant Noel provided such assistance with the knowledge that he was promoting illegal activity in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

145.   Defendant Noel is liable to plaintiff for the plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees in that he knowingly acted in concert with the Maxam Defendants' wrongful conduct that caused the plaintiff Plans' losses and in that he aided and abetted the wrongful conduct of the Maxam Defendants that caused the plaintiff Plans' losses.

146.   The conduct of defendant Noel as aforesaid was wanton and willful and undertaken in knowing violation of the law.

147.   Plaintiffs are entitled to recover compensatory damages for their actual losses, common law punitive damages and statutory damages pursuant to Gen. Stats. § 52-564 from defendant Noel on

56

account of his intentional and knowing acts of acting in concert with and aiding and abetting the theft of the plaintiff Plans' funds.

K.   **Eleventh Count:**   (Concerted action to commit theft and aiding and abetting theft – as to Defendant Tucker)

1. – 139.  Paragraphs 1 through 139 of the Ninth Count are incorporated as paragraphs 1 through 139 of the Eleventh Count.

140.   The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the fraudulent and illegal conduct of defendant Tucker described above, acting in concert with and pursuant to a common design with Madoff, the other Feeder Fund Defendants and the Madoff Family Member Defendants and others.

141.   Defendant Tucker knew that Madoff was acting in breach of his duty to persons who retained him as their investment manager and that the other Feeder Funds Defendants were acting in breach of their duty to persons who invested in Feeder Funds operated by the other Feeder Funds Defendants.

142.   Through his fraudulent and illegal conduct described above, defendant Tucker rendered substantial assistance and encouragement to Madoff and the other Feeder Funds Defendants in that defendant Tucker helped obtain necessary funding to enable the criminal scheme to continue and to facilitate the continued concealment of the existence of the criminal scheme and in that he intentionally did not disclose the fraudulent nature of Madoff's trading activity, even though he had a duty to do so.

57

143.     Defendant Tucker, knowing that the Maxam Defendants were engaged in the unlawful solicitation of investments through the use of misrepresentations and pursuant to fraudulent scheme, in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by facilitating the concealment of their illegal conduct and by promoting the success of investments with Madoff and Madoff Feeder Funds.

144.     Defendant Tucker provided such assistance with the knowledge that he was promoting illegal activity in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

145.     Defendant Tucker is liable to plaintiff for the plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees in that he knowingly acted in concert with the Maxam Defendants' wrongful conduct that caused the plaintiff Plans' losses and in that he aided and abetted the wrongful conduct of the Maxam Defendants that caused the plaintiff Plans' losses.

146.     The conduct of defendant Tucker as aforesaid was wanton and willful and undertaken in knowing violation of the law.

147.     Plaintiffs are entitled to recover compensatory damages for their actual losses, common law punitive damages and statutory damages pursuant to Gen. Stats. § 52-564 from defendant Tucker on

account of his intentional and knowing acts of acting in concert with and aiding and abetting the theft of the plaintiff Plans' funds.

**L.**   <u>**Twelfth Count**</u>:   **(Concerted action to commit theft and aiding and abetting theft – as to Defendant Peter B. Madoff)**

1. - 141.   Paragraphs 1 through 139 of the Ninth Count and paragraphs 142 and 143 of the Sixth Count are incorporated as paragraphs 1 through 141 of the Twelfth Count.

142.   The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the fraudulent and illegal conduct of defendant Peter B. Madoff described above, acting in concert with and pursuant to a common design with Madoff, the other Feeder Fund Defendants and the Madoff Family Member Defendants and others.

143.   Defendant Peter B. Madoff knew that Madoff was acting in breach of his duty to persons who retained him as their investment manager, that the other Feeder Funds Defendants were acting in breach of their duty to persons who invested in Feeder Funds operated by the other Feeder Funds Defendants, and that the other Madoff Family Member Defendants were acting in breach of their duty as officers and managers of BLMIS and MLIS.

144.   Through his fraudulent and illegal conduct described above, defendant Peter B. Madoff rendered substantial assistance and encouragement to Madoff, the Feeder Funds Defendants and the other Madoff Family Members in that defendant Peter B. Madoff helped to facilitate the continued concealment

of the existence of the criminal scheme and in that he intentionally did not disclose the fraudulent nature of Madoff's trading activity, even though he had a duty to do so.

145.   Defendant Peter B. Madoff, knowing that the Maxam Defendants were engaged in the unlawful solicitation of investments through the use of misrepresentations and pursuant to fraudulent scheme, in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by facilitating the concealment of their illegal conduct.

146.   Defendant Peter B. Madoff provided such assistance with the knowledge that he was promoting illegal activity in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

147.   Defendant Peter B. Madoff is liable to plaintiff for the plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees in that he knowingly acted in concert with the Maxam Defendants' wrongful conduct that caused the plaintiff Plans' losses and in that he aided and abetted the wrongful conduct of the Maxam Defendants that caused the plaintiff Plans' losses.

148.   The conduct of defendant Peter B. Madoff as aforesaid was wanton and willful and undertaken in knowing violation of the law.

149.   Plaintiffs are entitled to recover compensatory damages for their actual losses, common law punitive damages and statutory damages pursuant to Gen. Stats. § 52-564 from defendant Peter B.

Madoff on account of his intentional and knowing acts of acting in concert with and aiding and abetting the theft of the plaintiff Plans' funds.

M.   **Thirteenth Count:** **(Concerted action to commit theft and aiding and abetting theft — as to Defendant Mark D. Madoff)**

1. - 141.   Paragraphs 1 through 139 of the Ninth Count and paragraphs 142 and 143 of the Seventh Count are incorporated as paragraphs 1 through 141 of the Thirteenth Count.

142.   The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the fraudulent and illegal conduct of defendant Mark D. Madoff described above, acting in concert with and pursuant to a common design with Madoff, the other Feeder Fund Defendants and the Madoff Family Member Defendants and others.

143.   Defendant Mark D. Madoff knew that Madoff was acting in breach of his duty to persons who retained him as their investment manager, that the other Feeder Funds Defendants were acting in breach of their duty to persons who invested in Feeder Funds operated by the other Feeder Funds Defendants, and that the other Madoff Family Member Defendants were acting in breach of their duty as officers and managers of BLMIS and MLIS.

144.   Through his fraudulent and illegal conduct described above, defendant Mark D. Madoff rendered substantial assistance and encouragement to Madoff, the Feeder Funds Defendants and the other Madoff Family Members in that defendant Mark D. Madoff helped to facilitate the continued

61

concealment of the existence of the criminal scheme and in that he intentionally did not disclose the fraudulent nature of Madoff's trading activity, even though he had a duty to do so.

145.   Defendant Mark D. Madoff, knowing that the Maxam Defendants were engaged in the unlawful solicitation of investments through the use of misrepresentations and pursuant to fraudulent scheme, in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by facilitating the concealment of their illegal conduct.

146.   Defendant Mark D. Madoff provided such assistance with the knowledge that he was promoting illegal activity in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

147.   Defendant Mark D. Madoff is liable to plaintiff for the plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees in that he knowingly acted in concert with the Maxam Defendants' wrongful conduct that caused the plaintiff Plans' losses and in that he aided and abetted the wrongful conduct of the Maxam Defendants that caused the plaintiff Plans' losses.

148.   The conduct of defendant Mark D. Madoff as aforesaid was wanton and willful and undertaken in knowing violation of the law.

149.   Plaintiffs are entitled to recover compensatory damages for their actual losses, common law punitive damages and statutory damages pursuant to Gen. Stats. § 52-564 from defendant Mark D.

Madoff on account of his intentional and knowing acts of acting in concert with and aiding and abetting the theft of the plaintiff Plans' funds.

**N.    Fourteenth Count:  (Concerted action to commit theft and aiding and abetting theft -- as to Defendant Andrew H. Madoff)**

1. - 141.  Paragraphs 1 through 139 of the Ninth Count and paragraphs 142 and 143 of the Eighth Count are incorporated as paragraphs 1 through 141 of the Fourteenth Count.

142.    The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the fraudulent and illegal conduct of defendant Andrew H. Madoff described above, acting in concert with and pursuant to a common design with Madoff, the other Feeder Fund Defendants and the Madoff Family Member Defendants and others.

143.    Defendant Andrew H. Madoff knew that Madoff was acting in breach of his duty to persons who retained him as their investment manager, that the other Feeder Funds Defendants were acting in breach of their duty to persons who invested in Feeder Funds operated by the other Feeder Funds Defendants, and that the other Madoff Family Member Defendants were acting in breach of their duty as officers and managers of BLMIS and MLIS.

144.    Through his fraudulent and illegal conduct described above, defendant Andrew H. Madoff rendered substantial assistance and encouragement to Madoff, the Feeder Funds Defendants and the other Madoff Family Members in that defendant Andrew H. Madoff helped to facilitate the continued

concealment of the existence of the criminal scheme and in that he intentionally did not disclose the fraudulent nature of Madoff's trading activity, even though he had a duty to do so.

145.    Defendant Andrew H. Madoff, knowing that the Maxam Defendants were engaged in the unlawful solicitation of investments through the use of misrepresentations and pursuant to fraudulent scheme, in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by facilitating the concealment of their illegal conduct.

146.    Defendant Andrew H. Madoff provided such assistance with the knowledge that he was promoting illegal activity in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

147.    Defendant Andrew H. Madoff is liable to plaintiff for the plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees in that he knowingly acted in concert with the Maxam Defendants' wrongful conduct that caused the plaintiff Plans' losses and in that he aided and abetted the wrongful conduct of the Maxam Defendants that caused the plaintiff Plans' losses.

148.    The conduct of defendant Andrew H. Madoff as aforesaid was wanton and willful and undertaken in knowing violation of the law.

149.    Plaintiffs are entitled to recover compensatory damages for their actual losses, common law punitive damages and statutory damages pursuant to Gen. Stats. § 52-564 from defendant Andrew H.

64

Madoff on account of his intentional and knowing acts of acting in concert with and aiding and abetting the theft of the plaintiff Plans' funds.

**O.**     **Fifteenth Count:** (Fraudulent inducement – as to Maxam Defendants)

1. - 135.  Paragraphs 1 through 135 of the First Count are incorporated as paragraphs 1 through 135 of the Fifteenth Count.

136.    The false statements to the plaintiff Plans by the Maxam Defendants set forth above were made intentionally and with knowledge of the falsity.

137.    The Maxam Defendants knew the plaintiff Plans would rely on such false statements in deciding whether to purchase limited partnership interests in the Maxam feeder fund.

138.    The Maxam Defendants intended, by their false statements, to induce the plaintiff Plans to purchase limited partnership interests in the Maxam feeder fund.

139.    The plaintiff Plans relied on the false statements by the Maxam Defendants in deciding to purchase limited partnership interests in the Maxam feeder fund.

140.    The plaintiff Plans are entitled to rescind their purchase of such limited partnership interests in the Maxam Feeder Fund and to recovery of the purchase price paid for such limited partnership interests.

141.    The conduct of the Maxam Defendants as aforesaid was wanton and willful and undertaken in knowing violation of the law, to enable them to reap enormous illegal monies that they would not otherwise have been entitled to receive.

65

P.     <u>Sixteenth Count</u>:   (Aiding and abetting fraudulent inducement –
                                as to Defendant Noel)

1. - 141.  Paragraphs 1 through 141 of the Fifteenth Count are incorporated as paragraphs 1
through 141 of the Sixteenth Count.

142.    Defendant Noel, knowing that the Maxam Defendants were engaged in fraudulent activity
in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial
assistance to the Maxam Defendants by both facilitating the concealment of their fraudulent conduct and
by promoting the success of investments with Madoff and Madoff Feeder Funds.

143.    Defendant Noel provided such assistance with the knowledge that he was promoting
fraudulent conduct in violation of the law and with knowledge that he was helping to induce investors to
place their monies in an illegal investment operation, in breach of his obligations to obey the law and not
participate in defrauding third parties investing with the Maxam Defendants.

144.    The plaintiff Plans' lost investments, lost investment opportunities and losses from
payment of unwarranted fees were caused by the conduct of defendant Noel in aiding and abetting the
Maxam Defendants' fraudulent activity.

145.    The plaintiff Plans are entitled to rescind their purchase of such limited partnership
interests in the Maxam Feeder Fund and to recovery from defendant Noel of the purchase price paid for
such limited partnership interests.

146.    The conduct of defendant Noel as aforesaid was wanton and willful and undertaken in
knowing violation of the law.

Q.      <u>Seventeenth Count</u>:  (Aiding and abetting fraudulent inducement –
                                   as to Defendant Tucker)

1. - 141.  Paragraphs 1 through 141 of the Fifteenth Count are incorporated as paragraphs 1 through 141 of the Seventeenth Count.

142.    Defendant Tucker, knowing that the Maxam Defendants were engaged in fraudulent activity in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by facilitating the concealment of their fraudulent conduct and by promoting the success of investments with Madoff and Madoff Feeder Funds.

143.    Defendant Noel provided such assistance with the knowledge that he was promoting fraudulent conduct in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

144.    The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the conduct of defendant Noel in aiding and abetting the Maxam Defendants' fraudulent activity.

145.    The plaintiff Plans are entitled to rescind their purchase of such limited partnership interests in the Maxam Feeder Fund and to recovery from defendant Noel of the purchase price paid for such limited partnership interests.

67

146.   The conduct of defendant Noel as aforesaid was wanton and willful and undertaken in knowing violation of the law.

**R.**   **Eighteenth Count:**   **(Aiding and abetting fraudulent inducement – as to Defendant Peter B. Madoff)**

1. - 143.   Paragraphs 1 through 141 of the Fifteenth Count and paragraphs 143 and 144 of the Sixth Count are incorporated as paragraphs 1 through 143 of the Eighteenth Count.

144.   Defendant Peter B. Madoff, knowing that the Maxam Defendants were engaged in fraudulent activity in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by both promoting their fraudulent conduct and facilitating the concealment of their fraudulent conduct.

145.   Defendant Peter B. Madoff provided such assistance with the knowledge that he was promoting fraudulent conduct in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

146.   The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the conduct of defendant Peter B. Madoff in aiding and abetting the Maxam Defendants' fraudulent activity.

147.   The plaintiff Plans are entitled to rescind their purchase of such limited partnership interests in the Maxam Feeder Fund and to recovery from defendant Peter B. Madoff of the purchase price paid for such limited partnership interests.

148.   The conduct of defendant Peter B. Madoff as aforesaid was wanton and willful and undertaken in knowing violation of the law.

S.     **Nineteenth Count:** (Aiding and abetting fraudulent inducement – as to Defendant Mark D. Madoff)

1. - 143.  Paragraphs 1 through 141 of the Fifteenth Count and paragraphs 143 and 144 of the Seventh Count are incorporated as paragraphs 1 through 143 of the Nineteenth Count.

144.   Defendant Mark D. Madoff, knowing that the Maxam Defendants were engaged in fraudulent activity in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by both promoting their fraudulent conduct and facilitating the concealment of their fraudulent conduct.

145.   Defendant Mark D. Madoff provided such assistance with the knowledge that he was promoting fraudulent conduct in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

146.   The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the conduct of defendant Mark D. Madoff in aiding and abetting the Maxam Defendants' fraudulent activity.

147.   The plaintiff Plans are entitled to rescind their purchase of such limited partnership interests in the Maxam Feeder Fund and to recovery from defendant Mark D. Madoff of the purchase price paid for such limited partnership interests.

148.   The conduct of defendant Mark D. Madoff as aforesaid was wanton and willful and undertaken in knowing violation of the law.

T.   **Twentieth Count:**   **(Aiding and abetting fraudulent inducement – as to Defendant Andrew H. Madoff)**

1. - 143.  Paragraphs 1 through 141 of the Fifteenth Count and paragraphs 143 and 144 of the Eighth Count are incorporated as paragraphs 1 through 143 of the Twentieth Count.

144.   Defendant Andrew H. Madoff, knowing that the Maxam Defendants were engaged in fraudulent activity in breach of their duty to their investors, including the plaintiff Plans, intentionally provided substantial assistance to the Maxam Defendants by both promoting their fraudulent conduct and facilitating the concealment of their fraudulent conduct.

70

145.    Defendant Andrew H. Madoff provided such assistance with the knowledge that he was promoting fraudulent conduct in violation of the law and with knowledge that he was helping to induce investors to place their monies in an illegal investment operation, in breach of his obligations to obey the law and not participate in defrauding third parties investing with the Maxam Defendants.

146.    The plaintiff Plans' lost investments, lost investment opportunities and losses from payment of unwarranted fees were caused by the conduct of defendant Andrew H. Madoff in aiding and abetting the Maxam Defendants' fraudulent activity.

147.    The plaintiff Plans are entitled to rescind their purchase of such limited partnership interests in the Maxam Feeder Fund and to recovery from defendant Andrew H. Madoff of the purchase price paid for such limited partnership interests.

148.    The conduct of defendant Andrew H. Madoff as aforesaid was wanton and willful and undertaken in knowing violation of the law.

U.    **Twenty-First Count:**    **(Violation of Connecticut Unfair Trade Practices Act – as to Maxam Defendants)**

1. - 147.    Paragraphs 1 through 138 of the Ninth Count and paragraphs 136 through 144 of the Fifteenth Count are incorporated as paragraphs 1 through 147 of the Twenty-First Count.

148.    The Maxam Defendants acted, as alleged herein, in the conduct of trade or commerce as defined in Gen. Stats. § 42-110a(4).

149. The conduct of the Maxam Defendants, as alleged herein, was illegal, unfair, deceptive and violated the public policy of the State of Connecticut.

150. The conduct of the Maxam Defendants, as alleged herein, violated the Connecticut Unfair Trade Practices Act, Gen. Stats. §§ 42-110a, et seq.

151. As a consequence of the wrongful conduct of the Maxam Defendants, as alleged herein, plaintiffs have suffered financial loss.

**V.    Twenty-Second Count:   (Violation of Connecticut Unfair Trade Practices Act – as to Fairfield Greenwich Group Defendants)**

1. - 173. Paragraphs 1 through 147 of the Twenty-First Count, paragraphs 140 through 147 of the Tenth Count, paragraphs 140 through 147 of the Eleventh Count, paragraphs 142 through 146 of the Sixteenth Count and paragraphs 142 through 146 of the Seventeenth Count are incorporated as paragraphs 1 through 164 of the Twenty-Second Count.

174. The Fairfield Greenwich Group Defendants acted, as alleged herein, in the conduct of trade or commerce as defined in Gen. Stats. § 42-110a(4).

175. The conduct of the Fairfield Greenwich Group Defendants, in rendering substantial, intentional and knowing assistance to the illegal and fraudulent conduct of the Maxam Defendants as alleged herein, was illegal, unfair, deceptive and violated the public policy of the State of Connecticut.

176. The conduct of the Fairfield Greenwich Group Defendants, as alleged herein, violated the Connecticut Unfair Trade Practices Act, Gen. Stats. §§ 42-110a, et seq.

177.   As a consequence of the wrongful conduct of the Fairfield Greenwich Group Defendants, as alleged herein, plaintiffs have suffered financial loss.

**W.**   **Twenty-Third Count:**   **(Violation of Connecticut Unfair Trade Practices Act – as to Madoff Family Member Defendants)**

1. - 186.   Paragraphs 1 through 147 of the Twenty-First Count, paragraphs 142 through 149 of the Twelfth Count, paragraphs 142 through 149 of the Thirteenth Count, paragraphs 142 through 149 of the Fourteenth Count, paragraphs 144 through 148 of the Eighteenth Count, paragraphs 144 through 148 of the Nineteenth Count and paragraphs 144 through 148 of the Twentieth Count are incorporated as paragraphs 1 through 177 of the Twenty-Third Count.

187.   The Madoff Family Member Defendants acted, as alleged herein, in the conduct of trade or commerce as defined in Gen. Stats. § 42-110a(4).

188.   The conduct of the Madoff Family Member Defendants, in rendering substantial, intentional and knowing assistance to the illegal and fraudulent conduct of the Maxam Defendants as alleged herein, as alleged herein, was illegal, unfair, deceptive and violated the public policy of the State of Connecticut.

189.   The conduct of the Madoff Family Member Defendants, as alleged herein, violated the Connecticut Unfair Trade Practices Act, Gen. Stats. §§ 42-110a, et seq.

190.   As a consequence of the wrongful conduct of the Madoff Family Member Defendants, as alleged herein, plaintiffs have suffered financial loss.

73

**X.**   **Twenty-Fourth Count**: **(Conspiracy – as to all Defendants)**

1. - 212.  Paragraphs 1 through 173 of the Twenty-Second Count and paragraphs 148 through 186 of the Twenty-Third Count are incorporated as paragraphs 1 through 212 of the Twenty-Fourth Count.

213.  The defendants combined together, and with Bernard L. Madoff, to commit the wrongful conduct described herein, causing plaintiffs to sustain the economic losses described herein.

214.  Each defendant committed one or more overt acts, as described above, in furtherance of their wrongful scheme.

215.  Plaintiffs have sustained economic loss as a result of defendants' conspiracy to commit the wrongful conduct described herein.

**Y.**   **Twenty-Fifth Count**: **(Breach of Fiduciary Duty –**
                                    **as to Defendants Manzke and Maxam Capital)**

1. - 7.  Paragraphs 1 and 7 of the First Count are incorporated as paragraphs 1 and 7 of the Twenty-Fifth Count.

8.  For some time prior to the fall of 1984, defendant Manzke was employed as a partner at Rogers, Casey and Barksdale ["Rogers, Casey"], an investment consulting firm that provided pension consulting services to the plaintiff Plans, and defendant Manzke provided services to the Plans in her capacity as a partner of Rogers, Casey.

74

9.      In or about 1984, defendant Manzke left the employee of Rogers, Casey and formed her own company, Tremont Partners, Inc. ]"Tremont"] ,holding the corporation out as a highly-experienced and qualified company specializing in providing investment consulting services to the institutional market, including pension consulting services.

10.     Prior to and in February 1985, defendant Manzke contacted the plaintiff Town seeking to obtain a pension consulting contract for Tremont with the plaintiff Plans.

11.     On or about February 6, 1985, defendant Manzke submitted a written proposal seeking a contract for Tremont to serve as the plaintiff Plans' investment consultant, including within the scope of Tremont's proposed consulting services identifying, evaluating, recommending and monitoring investment managers with whom or which the Plans would place investments.

12.     In February 1985, the plaintiff Plans agreed to retain Tremont as their investment consultant and entered into a written consulting agreement with Tremont Partners on or about February 11, 1985.

13.     Commencing in February 1985, and continuing through November 30, 2005, Tremont served as pension investment consultant to the plaintiff Plans, with responsibility, *inter alia*, for identifying, evaluating, recommending and monitoring investment managers with whom or which the plaintiff Plans would place investments.

14. Commencing in February 1985, and continuing through April 2005, defendant Manzke was personally involved in providing pension consulting services to the plaintiff Plans on behalf of Tremont.

15. Throughout the time that she served as an investment consultant to the plaintiff Plans, defendant Manzke held herself out to plaintiffs as having superior knowledge, skill and expertise in the evaluation and management of investments for municipal pension plans, including determining whether particular investments were suitable for municipal pension plans.

16. At all times relevant herein, plaintiffs reposed their trust and confidence in defendant Manzke and, in particular, depended upon her superior investment knowledge to guide the plaintiff Plans' investment decisions.

17. At all times relevant herein, defendant Manzke knew that plaintiffs were reposing their trust and confidence in her and, in particular, were depending upon her superior investment knowledge to guide the plaintiff Plans' investment decisions.

18. As a consequence of defendant Manzke's superior knowledge, skill and expertise in the evaluation and management of investments and of plaintiffs' reliance upon her to manage the Plans' investments, defendant Manzke was under a fiduciary duty to represent plaintiffs' interests with heightened care and diligence; to provide objective, independent and conflict-free advice; and, with respect to her dealings with plaintiffs, to put plaintiffs' interests ahead of her own interests.

76

19.    At some time prior to 1997, defendant Manzke, acting in her own interests and on behalf of Tremont Partners, entered into a business arrangement with Bernard L. Madoff ("Madoff"), then a New York-based investment manager.  Pursuant to their business arrangement, defendant Manzke agreed to cause Tremont to form a hedge fund, in the form of a limited partnership, that would sell limited partnership interests to individuals and entities so as to create a substantial multi-million investment fund.  Tremont was to serve as the general partner of the hedge fund limited partnership and, as general partner, would retain Madoff to manage all of the limited partners' investments.

20.    Pursuant to defendant Manzke's arrangement with Madoff, Tremont would reap substantial annual payments as a result of its role as general partner and manager of the hedge fund.  Although investment managers normally charge their clients on the basis of a percentage of the client's annual investment, Madoff agreed that Tremont, rather than he, would be allowed to charge the hedge fund's investors such percentage fees and agreed that his compensation would be in the form of commissions on the trades he undertook, which would be processed through a broker-dealer company, Bernard L. Madoff Securities, Inc. ("BLMIS"), that he owned.  Tremont would, further, be able to charge the limited partners an annual fee for administrative services.  Pursuant to this business arrangement with Madoff, Tremont would, thus, be in a position to earn millions of dollars annually in return for raising money that would be placed with Madoff for his management.  Defendant Manzke, who was a principal owner of Tremont, stood to benefit substantially from this arrangement.

77

21.     In or about 1995, defendant Manzke caused Tremont to form The Broad Market Fund, LP (the "Tremont Fund"), a hedge fund in the form of a limited partnership that solicited a pool of investments from individuals and entities. As defendant Manzke had previously arranged with Madoff, Tremont served as the general partner of the Tremont Fund and placed all of the limited partners' investments with Madoff for his management.  Pursuant to their arrangement with Madoff, Tremont caused the Tremont Fund to pay Madoff commissions on his reported investment transactions and charged each limited partner of the Tremont Fund an annual percentage fee of 1% of the partner's investments for its "investment management" services on behalf of the Fund, as well as a .5% administrative fee for purported record-keeping and auditing.

22      By virtue of her position as investment advisor to the plaintiff Plans, defendant Manzke was in a position to take advantage of the plaintiff Plans' trust and confidence to induce the plaintiff Plans to invest funds with Madoff through the Tremont Fund.

23      In or about 1997, defendant Manzke recommended that the plaintiff Plans purchase a limited partnership interest in the Tremont Fund.  Defendant Manzke advised the Plans that Madoff was a successful money manager with whom it would be advantageous for the Plans to invest their funds. Defendant Manzke further advised the Plans that Madoff would not accept individual accounts for management, but that Tremont was in a position to enable the Plans to invest monies with Madoff through the pool of investment accounts created by the Tremont Fund.  Defendant Manzke recommended that the Plans invest $5 million in the Tremont Fund.

78

24      Because defendant Manzke stood to personally benefit from any investment the plaintiff Plans made in the Tremont Fund, she was, by virtue of her fiduciary relationship with the plaintiff Plans, under a duty to make full disclosure of the personal benefit to her from any investments in the Tremont Fund by the plaintiff Plans and to exercise a heightened duty of care to assure that the investment she was recommending in her own hedge fund was a safe and appropriate investment for the plaintiff Plans to make.

25      At the time defendant Manzke first recommended that the plaintiff Plans invest with Madoff, through the Tremont Fund, she was aware that Madoff purported to obtain his investment management success through a so-called "split-strike conversion" strategy that entailed the purchase of 30 to 40 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.  Defendant Manzke was further aware that Madoff contended that, through use of this strategy, he could limit losses when stock prices decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

26.      In fact, prior to and as of 1997, when defendant Manzke recommended the Plans invest in the Tremont Fund, Madoff was engaging in no actual stock or option transactions, and his purported investment management strategy was a sham to conceal Madoff's implementation of a massive Ponzi scheme supported by massive infusions of investments from large investors and "feeder funds" like the Tremont Fund.

79

27.     Had defendant Manzke performed the due diligence on Madoff required by her fiduciary obligations to the plaintiff Plans, she would have determined, at a minimum, that the performance history of Madoff could not be reasonably verified and, at best, that Madoff was engaging in criminal conduct. In either event, defendant Manzke should have determined that an investment with Madoff was not a suitable investment for the plaintiff Plans.

28.     Defendant Manzke did not, prior to recommending that the plaintiff Plans invest in the Tremont Fund, conduct a proper due diligence of Madoff.

29.     In or about June 1997, the plaintiff Plans purchased a $5 million limited partnership interest in the Tremont Fund in reliance on the recommendations and representations of defendant Manzke, which were based on inadequate due diligence investigations and tainted by conflicts of interest.

30.     The plaintiff Plans reposed their confidence in trust in defendant Manzke and made the decision to purchase a limited partnership interest in the Tremont Fund because of such confidence and trust.

31.     The plaintiff Plans would not have invested in the Tremont Fund in 1997 had defendant Manzke advised them that Madoff's performance record as an investment manager could not be verified or that Madoff was even possibly involved in criminal activity.

32.     From June 1997 through April 2005, when defendant Manzke left Tremont to start a new investment adviser company, she continued to be personally involved in providing pension investment advice to the plaintiff Plans.

80

33.    Subsequent to June 1997 and continuing through April 2005, defendant Manzke recommended that the plaintiff Plans increase their investment in the Tremont Fund by purchasing millions of dollars of additional limited partnership interests in the Tremont Fund, representing to the plaintiff Plans ed that Madoff was continuing to post successful annual investment returns in the range of 10% through use of his split-strike conversion strategy.

34.    In reliance on the advice, recommendations and representations of defendant Manzke, the plaintiff Plans made further purchases of limited partnership interests in the Tremont Fund between June 30, 2000 and September 30, 2003, with a resulting net investment of over $18 million.

35.    Defendant Manzke knew, or should have known, that the Tremont Fund was not a suitable investment for the plaintiff Plans in that (I) there was no independent verification of Madoff's investments since Madoff purported to maintain the investments at a broker-dealer that he owned rather than at an independent broker-dealer company; (ii) Madoff's reported annual returns were unusually consistent (in the range of 10% per annum), irrespective of annual market performance; (iii) Madoff's purported returns could not be replicated by other market professionals utilizing the same strategy; (iv) the purported strategy required abnormally and unrealistically large stock and option transactions; (v) Madoff's broker-dealer company was audited by an unusually small and unqualified accounting firm; and (vi) there was skepticism in the business media and among market professionals about the veracity of Madoff's reported returns.

36.   From 1997 through April 2005, Tremont received millions of dollars of fees paid by the Plans as a result of their investment in the Fund.  Defendant Manzke personally profited from the payment of these fees by virtue of her ownership of a substantial stake in Tremont.

37.   From 1997 through April 2005, defendant Manzke represented to the plaintiff Plans that she and Tremont were performing due diligence to monitor, review and verify Madoff's investment performance.

38.   Defendant Manzke repeatedly represented to the Plans from 1997 through April 2005 that Madoff was managing the Tremont Fund's investment portfolio utilizing a so-called "split strike conversion" strategy which, according to defendant Manzke, entailed the purchase of 45 to 50 large capitalization S&P 500 stocks and the simultaneous sale of out-of-the-money calls on the S&P 100 Index and the purchase of out-of-the-money puts on the S&P 100 Index.  According to defendant Manzke, through use of this strategy, Madoff sought to limit losses when stock prices decline while still affording an upside potential capped to the stock price of the short call when stock prices rise.

39.   Over the years from June 1997 through April 2005, defendant Manzke further represented to the plaintiff Plans that she had evaluated and monitored Madoff's performance as an investment manager and that Madoff had achieved consistent positive results ranging as high as 16.39% per annum (1997) and never lower than 7.8% per annum (2004) through use of the split strike conversion strategy, when, in fact, she had undertaken no such due diligence investigation and had no basis for making such representations about Madoff's performance.  Defendant Manzke advised and recommended that the

82

plaintiff Plans remain invested in the Fund to continue to benefit from Madoff's investment management skills.

40.     In fact, from June 1997 through April 2005, defendant Manzke failed to perform proper due diligence to review and verify Madoff's performance as an investment manager.

41.     Defendant Manzke intended for the plaintiff Plans to rely on her representations concerning her purported due diligent investigation of Madoff's performance s an investment manager.

42.     The Plans relied on defendant Manzke's representations and continued to maintain their investment in the Tremont Fund, as defendant Manzke intended, to the financial benefit of defendant Manzke.

43.     In or about April 2005, defendant Manzke left Tremont and formed a new company, defendant Maxam Capital, and caused defendant Maxam Capital to form a new hedge fund, Maxam Absolute Return Fund, LP (the "Maxam Fund").

44.     Subsequent to July 2006, defendant Manzke and the other Maxam Defendants approached the plaintiff Plans to solicit the plaintiff Plans to withdraw their investment in the Tremont Fund and invest the funds withdrawn from the Tremont Fund in the Maxam Fund.  In support of this solicitation, defendant Manzke prepared and distributed to the plaintiff Plans documents citing Madoff's performance results from 1997 through 2006 and further citing Madoff's purported split strike conversion strategy as the basis for his purported performance results. As an inducement to cause the plaintiff Plans

83

to switch their investments from the Tremont Fund to the Maxam, defendant Manzke offered to charge the plaintiff Plans lower fees than the Tremont Fund.

45.  Defendant Maxam Capital served as the investment manager of the Maxam Fund and received millions of dollars in management fees from the limited partners of the Maxam Fund for managing the partnership and administrative fees for record-keeping and administration of the partnership, including maintaining the books and records of the partnership, preparing periodic financial statements, reconciling the partnership's cash and portfolio positions, and arranging the annual audit of the partnership.

46.  As a principal owner of defendant Maxam Capital, defendant Manzke personally benefitted substantially from the fees paid to defendant Maxam Capital by investors in the Maxam Fund.

47.  Defendant Manzke knew that the plaintiffs continued to believe that she had superior knowledge, skill and expertise in advising on municipal pension plan investments and that the plaintiff Plans were relying on her superior knowledge, skill and expertise and their long-term relationship with her in deciding whether or not to purchase a limited partnership interest in the Maxam Fund.

48.  Defendant Maxam Capital held itself out to the plaintiffs as a registered investment adviser possessing superior knowledge, skill and expertise in advising on municipal pension plan investments.

84

49.   The Maxam Defendants knew that the plaintiff Plans were relying on defendant Maxam Capital's superior knowledge, skill and expertise in deciding whether or not to purchase a limited partnership interest in the Maxam Fund.

50.   The plaintiff Plans reposed their trust and confidence in defendants Maxam Capital and Manzke and, in particular, depended upon their superior investment knowledge in deciding whether or not to invest in the Maxam Fund.

51.   Defendants Manzke and Maxam Capital knew that the plaintiff Plans were reposing their trust and confidence in them and, in particular, were depending upon their superior investment knowledge to guide the plaintiff Plans' decisions whether or not to invest in the Maxam Fund.

52.   As a consequence of their superior knowledge, skill and expertise, and the plaintiff Plans' reliance on such superior knowledge, skill and expertise, defendants Manzke and Maxam Capital were under a fiduciary duty to the plaintiff Plans to represent the interests of the Plans with heightened care and diligence; to provide objective, independent and conflict-free advice; and to place such interests ahead of their own interests.

53.   In the course of their solicitations of the plaintiff Plans' investment in the Maxam Fund, defendants Manzke and Maxam Capital represented to the plaintiff Plans that, through their due diligence, they had determined that Madoff was producing positive investment results for the Maxam Fund (and the Plans' investment in the Maxam Fund) through use of the split strike conversion strategy, when, in fact, they had failed to perform proper due diligence investigations, knew or should have known

85

that such strategy would not produce the investment results reported by Madoff and had no basis for making such representations about Madoff's performance.

54.     The Plans relied on the representations of defendant Manzke and Maxam Capital about Madoff's performance from 1996 through 2007 and were induced to withdraw their investment in Madoff from the Tremont Fund and purchase a limited partnership interest in the Maxam Fund.

55.     Defendants Manzke and Maxam Capital did not conduct a proper due diligence on Madoff or his performance history prior to soliciting the plaintiff Plans to purchase a limited partnership interest in the Maxam Fund.

56.     When defendants Manzke and Maxam Capital solicited the plaintiff Plans' investment in the Maxam Fund, they knew or should have known that the split-strike conversion strategy could not, in and of itself, produce the results reported by Madoff and believed that Madoff was engaging in illegal insider trading to achieve these results.

57.     At all times mentioned herein, the Maxam Defendants knew or should have known and would have discovered through the exercise of proper due diligence that it was not possible to verify Madoff's purported investment returns and that an investment with Madoff was, thus, not suitable for the plaintiff Plans.

58.     The plaintiff Plans invested in the Maxam Fund in Maxam in reliance on the Maxam Defendants' representations concerning their due diligence on Madoff and the historic returns generated by Madoff.

59.     Had the Maxam Defendants performed reasonable due diligence on Madoff in 2006 and thereafter, they would have determined that Madoff's performance history could not reasonably be verified.

60.     Had the Maxam Defendants performed proper due diligence on Madoff in 2006 and thereafter, they would have advised the plaintiff Plans that they were unable to verify the historic investment returns reported by Madoff.

61.     Had the Maxam Defendants performed proper due diligence on Madoff in 2006 and thereafter, they would have advised the plaintiff Plans that the Maxam Fund was not a suitable investment for the plaintiff Plans.

62.     Defendant Manzke and the other Maxam Defendants knew or should have known at the time they solicited the plaintiff Plans to purchase a limited partnership interest in the Maxam Fund that Madoff's performance results could not be verified and that the Maxam Fund was not a suitable investment for the plaintiff Plans.

63.     Defendant Manzke and the other Maxam Defendants knew or should have known at the time they solicited the plaintiff Plans to purchase a limited partnership interest in the Maxam Fund, that the Maxam Fund was not a suitable investment for the plaintiff Plans in that (I) there was no independent verification of Madoff's investments since Madoff purported to maintain the investments at a broker-dealer that he owned rather than at an independent broker-dealer company; (ii) Madoff's reported annual returns were unusually consistent (in the range of 10% per annum), irrespective of annual market

performance; (iii) Madoff's purported returns could not be replicated by other market professionals utilizing the same strategy; (iv) the purported strategy required abnormally and unrealistically large stock and option transactions; (v) Madoff's broker-dealer company was audited by an unusually small and unqualified accounting firm; and (vi) there was skepticism in the business media and among market professionals about the veracity of Madoff's reported returns.

64.     The plaintiff Plans would not have invested in the Maxam Fund had the Maxam Defendants advised the plaintiff Plans that Madoff's performance history could not be reasonably verified.

65.     The plaintiff Plans would not have invested in the Maxam Fund had the Maxam Defendants advised the plaintiff Plans that the Maxam Fund was not a suitable investment for the plaintiff Plans.

66.     The plaintiff Plans would not have invested in the Maxam Fund had they known that Madoff's performance results were the result of illegal investment transactions.

67.     In July 2007, in reliance on the Maxam Defendants' representations as aforesaid, the plaintiff Plans withdrew $30 million from the Tremont Fund for the purpose of investing such funds in the Maxam Fund.  The funds were used to purchase a $30 million limited partnership interest in the Maxam Fund on July 3, 2007.

88

68.     In and after July 2007, defendants Manzke and Maxam Capital caused the Maxam Defendants to continue to represent to the plaintiff Plans that, on the basis of their due diligence, they had determined that Madoff was producing positive investment results for the Maxam Fund (and the Plans' investment in the Maxam Fund) through use of the split-strike conversion strategy, when, in fact, the Maxam Defendants had failed to conduct proper due diligence investigations and further knew that the split-strike conversion strategy could not, in and of itself, produce the results reported by Madoff and believed that Madoff was engaging in illegal insider trading to achieve these results.

69.     The plaintiff Plans relied on the Maxam Defendants' representations as aforesaid in deciding whether to make further investments in the Maxam Fund.

70.     In January 2008, relying on the Maxam Defendants' representations, the plaintiff Plans withdrew $7,443,175.43 from the Tremont Fund for the purpose of investing such funds in the Maxam Fund.  The funds were used to purchase a $7,443,175.43 limited partnership interest in the Maxam Fund on January 3, 2008.

71.     The plaintiff Plans would not have continued to invest in the Maxam Fund had they known that Madoff's performance results could not be verified.

72.     The plaintiff Plans would not have continued to invest in the Maxam Fund had they known that the Maxam Defendants had not verified Madoff's performance results or performed other proper due diligence on Madoff.

73.     The plaintiff Plans would not have continued to invest in the Maxam Fund had they known that the Maxam Fund was not a suitable investment for pension funds.

74.     The plaintiff Plans would not have continued to invest in the Maxam Fund had they known that Madoff's performance results were the result of illegal investment transactions.

75.     In 2007 and 2008, the Maxam Defendants advised the plaintiff Plans that the Plans' investments in the Maxam Fund were appreciating in value.

76.     On December 3, 2008, the Maxam Defendants provided the Plans with an Investor Statement reporting that the Plans had a capital balance in the Maxam Fund of $41,885,901.22 as of November 30, 2008.

77.     In December 2008, plaintiffs learned that Bernard Madoff had, for years, operated a Ponzi scheme; that he had not made actual investments for either the Tremont Fund or the Maxam Fund and had provided false information and false audit reports about sham investments being held by his broker-dealer company; that the Plans' investments in the Maxam Fund were worthless (and had been when made); and that the Plans had paid thousands of dollars in unwarranted fees to the Maxam Defendants.

78.     The plaintiff Plans have suffered financial losses as a result of defendant Manzke's and defendant Maxam Capital's breach of their fiduciary duty to the plaintiff Plans.

79.    The conduct of defendant Manzke and defendant Maxam Capital as aforesaid was wanton and willful and undertaken in knowing violation of their obligations to plaintiffs, to enable defendants to reap enormous illegal monies that they would not otherwise have been entitled to receive.

Z.    Twenty-Sixth Count: (Negligence – as to Maxam Defendants)

1 - 77.  Paragraphs 1 through 77 of the Twenty-Fifth Count are incorporated as paragraphs 1 through 77 of the Twenty-Sixth Count.

78.    Plaintiffs have sustained financial loss as a result of the negligence of the Maxam Defendants, in one or more of the following respects:

a.  in that the Maxam Defendants failed to perform proper due diligence on Madoff prior to recommending that the plaintiff Plans purchase limited partnership interests in the Maxam Feeder Fund;

b.  in that prior to recommending that the plaintiff Plans purchase limited partnership interests in the Maxam Feeder Fund, the Maxam Defendants failed to advise the plaintiff Plans that the performance history of Madoff could not be verified;

c.  in that prior to recommending that the plaintiff Plans purchase limited partnership interests in the Maxam Feeder Fund, the Maxam Defendants failed to advise the plaintiff Plans that the Maxam Feeder Fund was not a suitable investment for municipal pension plans;

d.  in that the Maxam Defendants recommended that the plaintiff Plans invest in the Maxam Fund even though it was not a suitable investment for the plaintiff Plans;

91

f.  in that the Maxam Defendants recommended that the plaintiff Plans purchase additional limited partnership interests in the Maxam Feeder Fund even though they had not performed proper due diligence on Madoff.

AA.   <u>Twenty-Seventh Count</u>: (Unjust Enrichment – as to Maxam Defendants)

1. - 77.  Paragraphs 1 through 77 of the Twenty-Fifth Count are incorporated as paragraphs 1 through 77 of the Twenty-Seventh Count.

78.   The plaintiff Plans have paid hundreds of thousands of dollars in unwarranted fees to the Maxam Defendants on purported assets and investment earnings in the Maxam Feeder Fund that were, in fact, non-existent.

79.   The Maxam Defendants have profited, at the plaintiff Plans' expense, from the unwarranted fees the plaintiff Plans paid to the Maxam Defendants.

80.   The Maxam Defendants have been unjustly enriched, at the expense of the plaintiff Plans, to plaintiffs' financial detriment.

81.   Plaintiffs are entitled to recover the amounts that the Maxam Defendants have been unjustly enriched at the expense of the plaintiff Plans.

92

PLAINTIFFS THE RETIREMENT PROGRAM
FOR EMPLOYEES OF THE TOWN OF
FAIRFIELD, THE RETIREMENT PROGRAM
FOR POLICE OFFICERS AND FIREMEN OF THE
TOWN OF FAIRFIELD, AND THE TOWN OF
FAIRFIELD,


BY_____

    DAVID S. GOLUB
    JONATHAN M. LEVINE
    SILVER GOLUB & TEITELL LLP
    184 ATLANTIC STREET
    P.O. BOX 389
    STAMFORD, CT  06904
    (203) 325-4491

    and

    RICHARD C. ROBINSON
    PULLMAN & COMLEY LLC
    90 STATE HOUSE SQUARE
    HARTFORD, CT 06103
    (860) 424-4300

## CLAIMS FOR RELIEF

Plaintiffs claim monetary damages against the defendants in excess of fifteen thousand dollars, including:

1.     Entry of an order requiring defendants to pay plaintiffs the consideration plaintiffs paid for their limited partnership interests in the Maxam Feeder Fund, together with interest at eight per cent per year and attorneys' fees, pursuant to Gen. Stats. § 36b-29(a) and/or (b);

2.     Compensatory damages for plaintiffs' financial losses, including compensatory damages for their losses from their purchase of limited partnership interests in the Maxam Feeder Fund;

3.     Entry of an order rescinding the plaintiff Plans' purchase of limited partnership interests in the Maxam Feeder Fund and requiring defendants to repay plaintiffs the amount paid for such interests (together with interest);

4.     Statutory damages pursuant to Gen. Stats. § 52-564.

5.     Common law punitive damages;

6.     Statutory punitive damages pursuant to Gen. Stats. § 42a-110g(a);

7.     Attorneys' fees and costs pursuant to Gen. Stats. § 42a-110g(d);

8.     Such other relief as the Court deems equitable.

94

Dated at Stamford, Connecticut this 26th day of October, 2010.

PLAINTIFFS THE RETIREMENT PROGRAM FOR
EMPLOYEES OF THE TOWN OF FAIRFIELD, THE
RETIREMENT PROGRAM FOR POLICE OFFICERS
AND FIREMEN OF THE TOWN OF FAIRFIELD,
AND THE TOWN OF FAIRFIELD,

BY_____

DAVID S. GOLUB
JONATHAN M. LEVINE
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CT  06904
(203) 325-4491

    and

RICHARD C. ROBINSON
PULLMAN & COMLEY LLC
90 STATE HOUSE SQUARE
HARTFORD, CT 06103
(860) 424-4300

ATTEST: A TRUE COPY

ABRAHAM GLASSMAN
CT STATE MARSHAL
HARTFORD COUNTY

95